IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Jacksonville Division

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY** and **NOKUSE EDUCATION, INC.**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **U.S. FISH AND WILDLIFE SERVICE; MARTHA WILLIAMS**, in her official capacity as Director of the U.S. Fish and Wildlife Service; and **DEBRA HAALAND**, in her official capacity as Secretary of the U.S. Department of the Interior, <br><br> *Defendants*. | Case No. 3:23-cv-936-WWB-LLL |

**PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY AND NOKUSE EDUCATION, INC.'S MOTION SUPPLEMENT THE ADMINISTRATIVE RECORD AND MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... iii

EXHIBIT INDEX ........................................................................................................... vi

INTRODUCTION ............................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 2

    I.       The Imperiled Gopher Tortoise and the Service's Decision to
            Deny Endangered Species Act Protection to It ................................................ 2

    II.      The Current Lawsuit and the Administrative Record ...................................... 3

ARGUMENT .................................................................................................................... 5

    I.       The Court may supplement the Administrative Record with the
            Shoemaker Declaration because it explains the complex subject
            of population modeling and associated technical terms in relation
            to the PVA Model the Service relied on when making its Not
            Warranted Finding ............................................................................................ 5

CONCLUSION ............................................................................................................... 13

LOCAL RULE 3.01(g) CERTIFICATION ................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Alabama-Tombigbee Rivers Coalition v. Kempthorne*,
    477 F.3d 1250, 1262 (11th Cir. 2007) ............................................................. 7, 10

*Animal Defense Council v. Hodel*,
    840 F.2d 1432 (9th Cir. 1988) ................................................................................. 6

*BBX Capital Corp. v. FDIC*,
    No. 17-62317-CIV-COHN/SELTZER,
    2018 WL 6531601 (S.D. Fla. Aug. 15, 2018) ......................................................... 5

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................................ 5

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
    No. 17-cv-618-T-23MAP,
    2017 WL 6387977 (M.D. Fla., Dec. 14, 2017) ..................................................... 10

*Citizens for Smart Growth v. Sec'y of the Dep't of Transp.*,
    669 F.3d 1203 (11th Cir. 2012) ............................................................................. 13

*Coin Ctr. v. Yellen*,
    No. 3:22cv20375-TKW-ZCB,
    2023 WL 2889736 (N.D. Fla. Apr. 10, 2023) .................................................. 9–11

*Ellis v. Housenger*,
    No. C-13-1266 MMC,
    2015 WL 3660079 (N.D. Cal. June 12, 2015) ........................................................ 6

*Hewitt v. Comm'r of IRS*,
    21 F.4th 1336, 1342 (11th Cir. 2021) .................................................................... 13

*Marllantas, Inc. v. Rodriguez*,
    806 F. App'x 864 (11th Cir. 2020) .................................................................. 7, 10

*McElmurray v. U.S. Dep't of Agric.*,
    No. CV105-159,
    2007 WL 2893382 (S.D. Ga. Sep. 28, 2007) ................................................... 7, 10

*Miccosukee Tribe of Indians v. United States*,
    No. 95-0533-CIV-DAVIS,
    1998 WL 1805539 (S.D. Fla. Sep. 11, 1998) ............................................... 8–9, 13

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................ 12

*Nat'l Mining Ass'n v. Sec'y, U.S. Dep't of Labor*,
    812 F.3d 843 (11th Cir. 2016) .................................................................... 7, 10

*Organized Fishermen v. Franklin*,
    846 F. Supp. 1569 (S.D. Fla. 1994) .................................................................. 7

*Port of Jacksonville Mar. Ad Hoc Comm., Inc. v. U.S. Coast Guard*,
    788 F.2d 705 (11th Cir. 1986) ........................................................................ 13

*Pres. Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs*,
    87 F.3d 1242 (11th Cir. 1996) ................................................................ *passim*

*Ray v. McCullough Payne & Haan, LLC*,
    838 F.3d 1107 (11th Cir. 2016) ........................................................................ 7

*McNamara v. Gov't Emps. Ins. Co.*,
    30 F.4th 1055 (11th Cir. 2022) ......................................................................... 7

*Save the Manatee Club v. United States EPA*,
    No. 6:22-cv-868-CEM-LHP,
    2023 WL 4195043 (M.D. Fla. May 24, 2023) ................................................. 6

*Sierra Club v. U.S. Fish and Wildlife Serv.*,
    No. 2:20-cv-13-SPC-NPM,
    2021 WL 4478329 (M.D. Fla., Sept. 30, 2021) ............................................. 10

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
    No. 2:20-cv-13-SPC-NPM,
    2021 WL 5634131 (M.D. Fla. Dec. 1, 2021) ............................................ 6, 10

*Sierra Club v. U.S. Forest Service*,
    535 F. Supp. 2d 1268 (N.D. Ga. 2008) ...................................................... 8, 13

*SOSS2, Inc. v. U.S. Army Corps of Eng'rs*,
    403 F. Supp. 3d 1233 (M.D. Fla. 2019) ..................................................... 7, 10

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472, 496 (9th Cir. 2011) .................................................................... 6

**Statutes**

5 U.S.C. § 706(2) ................................................................................................ 1, 6

16 U.S.C. §§ 1531–1544 ........................................................................................ 1

16 U.S.C. § 1533(b)(1)(A) ............................................................................... 5, 13

16 U.S.C. § 1540(g)(1)(C) ..................................................................................... 5

**Other Sources**

87 Fed. Reg. 61834 (Oct. 12, 2022)...................................................................................2

# EXHIBIT INDEX

Exhibit 1 - Declaration of Kevin T. Shoemaker, Ph.D

## INTRODUCTION

Through this motion, Plaintiffs Center for Biological Diversity and Nokuse Education, Inc. (Plaintiffs) seek to ensure that the Court has before it the information necessary to determine whether the federal defendants (hereinafter, U.S. Fish and Wildlife Service or Service) violated the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544, and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), when they denied endangered species protection to the imperiled gopher tortoise.

To effectively review agency action, the Court must have a complete understanding of the information that was before the agency when it made its decision. Caselaw governing review of ESA and APA claims offers the Court flexibility to ensure it has this full understanding. For claims arising under the APA,[1] a Court may supplement the record when technical terms or complex subjects need to be explained. *Pres. Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n. 1 (11th Cir. 1996) [*P.E.A.C.H*]. Here, additional explanation is needed to review the Service's decision, which relied on an arbitrary population model that departed from the best available science to deny protections to the gopher tortoise, an imperiled species that is declining and faces extinction from habitat destruction, among other threats.

Accordingly, Plaintiffs move the Court for an order supplementing the Administrative Record prepared by the Service with a sworn expert declaration by Dr. Kevin Shoemaker that explains technical terms and complex subject matter in this case relating to the Service's population viability modeling for the gopher tortoise.

---

[1] As explained below, Plaintiffs allege several claims directly under the ESA. *See generally* ECF No. 1 at 33–34.

## FACTUAL AND PROCEDURAL BACKGROUND

I.  **The Imperiled Gopher Tortoise and the Service's Decision to Deny Endangered Species Act Protection to It**

The Service has failed to protect the gopher tortoise, a terrestrial turtle adapted for digging burrows that support hundreds of southeastern species, Administrative Record (AR) 003341, under the federal ESA despite the species' ongoing declines, AR 003440. While the Service has protected a small part of the far-western portion of tortoise's range as a threatened population since 1987, the agency has neglected to protect the majority of the tortoise's remaining range to the east, despite finding in 2011 that the eastern portion of the range also warranted protection as a listed species. AR 003657. The eastern tortoises then waited more than 10 years without protection until October 12, 2022, when the Service reversed course and found that protecting the species across its entire range—and in the eastern portion of its range—was not warranted (Not Warranted Finding).[2] AR 003657–91 (2022 Not Warranted Finding for the Gopher Tortoise, published at 87 Fed. Reg. 61834 (Oct. 12, 2022)). The Service denied protections for the gopher tortoise despite finding that "the numbers of individuals[ and] populations . . . were all expected to decline," and despite acknowledging that the "primary stressors" threatening the gopher tortoise, including "historical and current loss of habitat," are ongoing and "expected to persist in the foreseeable future." AR 003681–82. The Not Warranted Finding relied heavily on a population viability analysis model (PVA Model) the Service employed to predict the

---

[2] The western population of gopher tortoises retained their threatened status. AR 003657.

future status of the gopher tortoise, concluding that "extinction risk for the gopher tortoise is low in the future." AR 003682.

## II. The Current Lawsuit and the Administrative Record

On August 9, 2023, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief against the Service alleging that the Service violated the ESA and APA when it issued its Not Warranted Finding for the gopher tortoise. ECF No. 1. As alleged in the Complaint, the Service reached its Not Warranted Finding through a series of legal and logical errors that caused its decision to depart from the best available science and rational decisionmaking required under the ESA and APA. *Id.* at 23–33. Among those errors, the Service relied heavily on the PVA Model, which failed to use the best available science regarding the tortoise's life history and significant threats, leading to an arbitrarily inflated projection regarding the tortoise's future survival. *Id.* at 23.

The Service lodged with the Court an Administrative Record "consist[ing] of materials compiled by the U.S. Fish and Wildlife Service corresponding to its October 12, 2022 decision that listing the gopher tortoise (*Gopherus polyphemus*) as endangered or threatened under the Endangered Species Act is not warranted," ECF No. 13, and following negotiations with Plaintiffs, an amended Administrative Record with additional documents. ECF No. 19. The Administrative Record lodged in this case does not provide the complex, technical explanation of how the PVA model design influenced informational inputs to produce future population projections, nor does it adequately explain whether the informational inputs and the model's design align with the best available science about the gopher tortoise and its threats.

To understand these technical aspects of the PVA model, Plaintiffs contacted experts Dr. Kevin Shoemaker and Dr. Kevin Loope to review and explain it. Declaration of Kevin T. Shoemaker, Ph.D [hereinafter, Shoemaker Decl.] (Exhibit 1) at ¶ 1. Dr. Shoemaker and Dr. Loope have extensive experience with using conservation simulation models and expertise in turtle and tortoise ecology. *Id.* at ¶¶ 3–12.

Dr. Shoemaker executed a sworn declaration (Shoemaker Declaration) on June 26, 2024, that explains complex, technical aspects of the Service's PVA model. *See generally*, Shoemaker Decl. Dr. Shoemaker's Declaration states that he has "evaluated the [PVA] model and identified inconsistencies between how the simulation model works and [the Service's] own findings about gopher tortoise ecology and life history." *Id.* at ¶ 16. First, he explains that "unintentional consequences . . . of the modeling approach" caused "a strong positive feedback process that results in unrealistic runaway population growth for a substantial subset of [tortoise] populations." *Id.* at ¶¶ 18, 19–25. As a result of the model's design, he explains, "Virtually all of the populations that the [PVA] model predicts to be large and stable (or growing) by the end of the century are, in fact, propped up by hyper-inflated immigration . . . while all other populations are projected to experience moderate to severe declines." *Id.* at ¶ 25. Second, he explains that "the [PVA] model specified the maturation rate between juvenile and adult tortoises in a way that does not reflect gopher tortoise life history," *id.* at ¶ 26, which led the Service to "overestimate the number of individuals that are old enough to mature into adults, resulting in an erroneously high population growth estimate," *id.* at ¶ 28. He concludes, "In summary, virtually all of the original conclusions derived from the [PVA] model regarding gopher tortoises' future status

4

across their range are artifacts of modeling errors and are primarily driven by the unintended feedback process and the maturation rate error." *Id.* at ¶ 32.

The parties agree that Plaintiffs' claims in this case arise under the ESA[3] and the APA, and that the APA provides the standard of review for these claims.[4] ECF No. 10 at 2–3, 5. The Parties have conferred regarding the contents of the Administrative Record and successfully reached agreement regarding the scope of review for Plaintiffs' claims for every document except the one at issue here. ECF No. 18 at ¶¶ 7–8.

## ARGUMENT

I. **The Court may supplement the Administrative Record with the Shoemaker Declaration because it explains the complex subject of population modeling and associated technical terms in relation to the PVA Model the Service relied on when making its Not Warranted Finding.**

Plaintiffs respectfully seek an order supplementing[5] the Administrative Record with the Shoemaker Declaration to explain complex and technical aspects of the PVA

---

[3] Plaintiffs assert claims that arise directly under ESA Section 11(g)(1)(C), which authorizes citizen suits to correct an alleged "failure . . . to perform any act or duty under section 1533 . . . which is not discretionary with the [Service]." 16 U.S.C. § 1540(g)(1)(C). Specifically, Plaintiffs allege that the Service failed to comply with its nondiscretionary duty to base its decision solely on the best available science. ECF No. 1 at ¶¶ 27, 29, 105–07; *Bennett v. Spear*, 520 U.S. 154, 171–72 (1997) (finding language that the Service "shall make determinations . . . solely on the basis of the best scientific and commercial data available" is "plainly [one] of obligation rather than discretion"); 16 U.S.C. § 1533(b)(1)(A) (the Service "*shall* make determinations . . . solely on the basis of the best scientific . . . data available" (emphasis added)).

[4] The parties stated that "traditional discovery may not be necessary" to resolve Plaintiffs' claims, but "Plaintiffs reserved the right to seek discovery, if necessary." ECF No. 10 at 5.

[5] In this motion Plaintiffs use the term "supplement" to refer to including extra-record materials for the Court's consideration, which is analytically distinct from a motion to complete an administrative record with records that should have—but were not— included in the designated administrative record. *See BBX Capital Corp. v. FDIC*, No. 17-62317-CIV-COHN/SELTZER, 2018 WL 6531601, at *1 (S.D. Fla. Aug. 15, 2018) (distinguishing record "completion" and record "supplementation").

5

Model. As explained below, the Court is authorized to consider this extra-record material because the Court may consider the Shoemaker Declaration for an explanation of technical terms or complex subjects.

For claims raised directly under the APA,[6] review of agency action is based on the "whole record," 5 U.S.C. § 706(2); *P.E.A.C.H.*, 87 F.3d at 1246, which generally "includes 'all documents and materials directly or indirectly considered by agency decision-makers.'" *Save the Manatee Club v. United States EPA*, No. 6:22-cv-868-CEM-LHP, 2023 WL 4195043, at *3 (M.D. Fla. May 24, 2023). However "a court may go beyond the administrative record" and supplement it with extra-record materials if any one of the four circumstances exists:

    1) an agency's failure to explain its action effectively frustrates judicial review;

    2) it appears that the agency relied on materials not included in the record;

    3) technical terms or complex subjects need to be explained; or

    4) there is a strong showing of agency bad faith or improper behavior.

*P.E.A.C.H.*, 87 F.3d at 1246 n.1 (citing *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436–37 (9th Cir. 1988)); *Sierra Club v. U.S. Fish & Wildlife Serv.*, No. 2:20-cv-13-SPC-NPM, 2021 WL 5634131, at *3 (M.D. Fla. Dec. 1, 2021) (*Sierra Club II*) (recognizing that "the Eleventh Circuit described four exceptions" to the general

---

[6] While Plaintiffs focus on the APA claims, they do not concede that ESA claims are limited to an administrative record. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (holding that because the ESA independently authorizes a right of action, courts "may consider evidence outside the administrative record for the limited purposes of reviewing [an] ESA claim"); *Ellis v. Housenger,* No. C-13-1266 MMC, 2015 WL 3660079, at *4 (N.D. Cal. June 12, 2015) ("[W]here a claim is brought under [ESA] § 1540, the district court borrow[s] . . . the *standard* [of review] from the APA, but does not similarly borrow[ ] the APA's *scope* of review.").

principle that court review of administrative action is limited to the administrative record); *SOSS2, Inc. v. U.S. Army Corps of Eng'rs*, 403 F. Supp. 3d 1233, 1239 (M.D. Fla. 2019) (same); *McElmurray v. U.S. Dep't of Agric.*, No. CV105-159, 2007 WL 2893382, at *2 (S.D. Ga. Sep. 28, 2007) (same); *see Organized Fishermen v. Franklin*, 846 F. Supp. 1569, 1573 (S.D. Fla. 1994) (explaining that "[c]ourts have also permitted supplementation of the record through discovery where necessary to explain or clarify technical terms involved in the agency action"). Although in *Alabama-Tombigbee Rivers Coalition v. Kempthorne*, the Eleventh Circuit appeared to state that courts should only "go beyond the administrative record . . . where there is initially 'a strong showing of bad faith or improper behavior' by the agency," 477 F.3d 1250, 1262 (11th Cir. 2007), this narrow decision has not limited the set of original circumstances described in *P.E.A.C.H.* that permit a court to look beyond the administrative record. Indeed nearly a decade later, the Eleventh Circuit confirmed this, again citing *P.E.A.C.H.* while affirming that although the court has focused on agency bad faith, it "ha[s] acknowledged that *various factors* could be considered in determining the propriety of reviewing extra-record material on review of an agency rule." *Nat'l Mining Ass'n v. Sec'y, U.S. Dep't of Labor*, 812 F.3d 843, 875 (11th Cir. 2016) (emphasis added) (denying a motion for judicial notice where "the allegations of 'bad faith' made by the petitioners in their submissions [we]re not supported").[7]

---

[7] The Eleventh Circuit's decision in *Marllantas, Inc. v. Rodriguez*, 806 F. App'x 864, 867 (11th Cir. 2020), applying the "bad faith" factor, is a non-precedential, unpublished opinion. *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016) ("In this Court, unpublished decisions . . . are not precedential and they bind no one."); *McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060–61 (11th Cir. 2022) (same). *Marllantas* is also inapt where the movant argued that the record was incomplete and the agency had waived privilege. *Id.* Plaintiffs raise neither of these arguments here.

7

Courts in this circuit have considered extra-record evidence where "technical terms or complex subjects need to be explained." *P.E.A.C.H.*, 87 F.3d at 1246 n.1.  For example, in *Miccosukee Tribe of Indians v. United States*, the Southern District of Florida cited *P.E.A.C.H.* in support of its decision to consider depositions when reviewing an Environmental Protection Agency determination regarding Florida water quality standards. No. 95-0533-CIV-DAVIS, 1998 WL 1805539, at *14–15 (S.D. Fla. Sep. 11, 1998). There, the court found it was "necessary" to consider "evidence beyond the administrative record" where the depositions, which were taken after the EPA's review, "helped clarify complex, technical terms dealing with water quality criteria that were integral to the EPA's conclusions." *Id.* at *15.

Likewise, in *Sierra Club v. United States Forest Service*, the Northern District of Georgia cited *P.E.A.C.H.* in support of supplementing the record with "testimony not contained in the administrative record as to the meaning of the terms 'inventory' and 'population inventory information'" when deciding a case alleging National Environmental Policy Act and APA violations. 535 F. Supp. 2d 1268, 1291 (N.D. Ga. 2008). In those circumstances, the court found it was "appropriate . . . to look outside the administrative record" and further, that "[c]onsideration of [extra-record] testimony [wa]s *compelled* because of these terms' technical nature." *Id.* (emphasis added).

Similarly, here Plaintiffs have demonstrated that the Shoemaker Declaration "help[s] clarify complex, technical terms dealing with [the PVA model] that w[as] integral to the [Service's] conclusions." *See Miccosukee Tribe,* 1998 WL 1805539, at *15. The Shoemaker Declaration explains the complex subject of population viability modeling in the Service's PVA Model by describing key aspects of modeling and how the Service's

8

model worked. Shoemaker Decl. at ¶ 16 (explaining that Dr. Shoemaker "evaluated the [PVA] model and identified inconsistencies between how the simulation model works and [the Service's] own findings about gopher tortoise ecology and life history."); *id.* at ¶ 26 (explaining that "the [PVA] model specified the maturation rate between juvenile and adult tortoises in a way that does not reflect gopher tortoise life history")*; id.* at ¶ 20 (explaining that, in metapopulation models, immigration should be a "zero sum" process). The Shoemaker Declaration also explains technical terms relating to the PVA Model. *E.g.*, *id.* at ¶ 18 n. 3 (explaining the terms "landscape population" and "metapopulation"). The Service relied on this PVA Model to reach its Not Warranted Finding for the gopher tortoise, AR 003681–84, 003689–90; accordingly, the explanation of a complex subject and associated technical terms in the Shoemaker Declaration is directly relevant to Plaintiffs' claims in this case. Consequently, the Court's consideration of the Shoemaker Declaration would be "a permissible use of materials outside the administrative record." *Miccosukee Tribe,* 1998 WL 1805539, at *15.

Although in *Coin Center v. Yellen,* the Northern District of Florida declined to supplement an administrative record with an expert declaration where plaintiffs asserted that technical terms or complex subjects needed explanation, that case is inapt because it misconstrues Eleventh Circuit precedent and is factually distinguishable. No. 3:22cv20375-TKW-ZCB, 2023 WL 2889736 (N.D. Fla. Apr. 10, 2023). First, relying on *Kempthorne*, the court incorrectly asserted that "the only exception to the record rule actually recognized by the Eleventh Circuit is . . . bad faith or improper behavior by the agency," *id.* at *2, which disregards both the Eleventh Circuit's opinion in *P.E.A.C.H.*,

9

which recognized the four circumstances warranting supplementation, 87 F.3d at 1246 n.1, as well as the Eleventh Circuit's latest precedential decision in *National Mining Association*, 812 F.3d at 875, which considered record supplementation solely on the basis of bad faith *because the petitioners had alleged it* and also explicitly recognized "that *various factors* could be considered in determining the propriety of reviewing extra-record material on review of an agency rule." 812 F.3d at 875 (emphasis added). The Eleventh Circuit's opinion in *Kempthorne*, 477 F.3d at 1262, must be read in the context of the more recent precedential opinion in *National Mining Association*, 812 F.3d 875, which clarifies that demonstrated bad faith is not the only basis for supplementation.[8]

Second, *Coin Center* is also factually distinguishable from the case at hand.[9] In *Coin Center*, the court explained that it was "not persuaded" that a case reviewing an agency decision regarding a form of cryptocurrency under the International Emergency Economic Powers Act was "so complex that the challenged agency action is unreviewable." 2023 WL 2889736 at *3. Furthermore, the court found that similar information, including an article by the declarant, was already in the record. *Id.* And finally, the court found that the declaration contained more legal argument than

---

[8] Accordingly, cases denying requests to supplement administrative records because the plaintiffs failed to establish bad faith are inapt. *See, e.g.*, *Marllantas*, 806 F. App'x at 867 (11th Cir. 2020); *Sierra Club v. U.S. Fish and Wildlife Serv.*, No. 2:20-cv-13-SPC-NPM, 2021 WL 4478329, at *5–6 (M.D. Fla., Sept. 30, 2021) (*Sierra Club I*); *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, No. 17-cv-618-T-23MAP, 2017 WL 6387977, at *1–2 (M.D. Fla., Dec. 14, 2017); *McElmurray*, 2007 WL 2893382, at *1–2.

[9] Likewise, cases from this circuit that have denied requests to supplement administrative records based on other *P.E.A.C.H.* factors or because the plaintiffs failed to meet their burden are distinguishable. *See, e.g.*, *Sierra Club II*, 2021 WL 5634131, at *3–5 (focusing only on the first *P.E.A.C.H.* factor, agency failure to explain its action effectively frustrates judicial review); *SOSS2, Inc.*, 403 F. Supp. 3d at 1239 (denying a motion to supplement the record with "unspecified" extra-record evidence).

10

explanation, which was "better suited for . . . summary judgment briefing. *Id.*

The case at hand is distinguishable on all three points. First, the population modeling undertaken in the Service's PVA Model is highly complex, requiring advanced degrees and specialized expertise to review and explain it. *See* Shoemaker Decl. at ¶¶ 3–11 (describing Dr. Shoemaker's years of education, advanced degree, and modeling expertise and explaining how "[w]orking with students [on population ecology theory and simulation models] has helped [him] to readily recognize and describe common mistakes in population modeling").

Second, the documents in the Administrative Record do not provide an explanation of how the model works such that the Court can understand how the model handled the data inputs, whether the model's design aligns with species biology and threats, and how the model's predictions were ultimately produced. For example, the Shoemaker Declaration explains how the PVA model's design used theoretical "dummy" populations to model tortoise immigration, which should be a "zero sum process" (i.e., in total, no tortoises are gained and no tortoises are lost as they move between populations), *id.* at ¶ 20, but that the PVA Model's design ultimately resulted in "individual dummy landscape populations [that] often greatly exceed the combined abundance of all populations within the landscape population (a logical impossibility, since dummy landscape populations are intended to represent the pool of potential dispersers within the landscape population)," *id.* at ¶ 24. *See generally id.* at ¶¶ 19–25 (providing a full description of the model's design to predict tortoise immigration and the outcomes of that design). By comparison, the documents in the Administrative Record that reference the PVA Model do not explain how the model's theoretical structures

11

work, nor how those structures influenced the outcome of the model. AR 003678–80 (Not Warranted Finding summarizing that "[r]ecruitment into the adult stage by immigration was also modeled" but failing to provide a technical explanation of how the model approximated gopher tortoise immigration); AR 003446, 003452 (SSA summarizing the "model structure" fails to describe method of using a theoretical landscape population design to model immigration, and the influence of that model parameter to the model outcome); AR 003523–59 (SSA Appendix regarding gopher tortoise population modeling fails to explain how using the theoretical landscape population design to model immigration influenced the model outcome).

And finally, the Shoemaker Declaration contains technical explanations, not legal arguments. *E.g.*, Shoemaker Decl. at ¶ 28 (explaining how "the 'flat-age-within-stage' approach [used in the PVA model] . . . assum[es] that juvenile[ tortoises] all experience the same annual survival rate" and thus "will overestimate the number of individuals that are old enough to mature into adults, resulting in an erroneously high population growth rate").

In short, reviewing the Service's Not Warranted Finding without an explanation of the complex, technical PVA Model that the agency relied on frustrates the APA's standard of review. Under the APA, to determine whether the Service's Not Warranted Finding is arbitrary and capricious, the Court must consider whether the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the APA's standard of review is narrow, its "inquiry must be searching and

careful." *Citizens for Smart Growth v. Sec'y of the Dep't of Transp.*, 669 F.3d 1203, 1210–11 (11th Cir. 2012). "[A] court does not rubber stamp the action of the agency; rather, it must satisfy itself that the agency has articulated a rational connection between the facts found and the choice made." *Port of Jacksonville Mar. Ad Hoc Comm., Inc. v. U.S. Coast Guard*, 788 F.2d 705, 708 (11th Cir. 1986) (cleaned up); *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1342 (11th Cir. 2021). Without the Shoemaker Declaration's technical explanation of the PVA Model's workings, the Court cannot determine whether the agency has "articulated a rational connection between the facts found and the choice made," as the APA requires, because it is left with an opaque, unreviewable description of the model that does not reveal how the agency "articulated" the facts to reach its decision. *Port of* Jacksonville, 788 F.2d at 708. Nor can the Court determine whether the model is based on the best available science regarding the tortoise and its threats, as the ESA requires. *See* 16 U.S.C. § 1533(b)(1)(A).

Plaintiffs have demonstrated that the complex subject of the Service's PVA Model and associated technical terms need to be explained. Accordingly, supplementing the Administrative Record is appropriate—and indeed necessary—so that the Court can effectively review the Service's Not Warranted Finding. *See Sierra Club* 535 F. Supp. 2d 1268 at 1291; *Miccosukee Tribe*, 1998 WL 1805539, at *15.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court supplement the Administrative Record prepared by the Service with a sworn expert

13

declaration by Dr. Kevin Shoemaker that explains technical terms and complex subject matter relevant to Plaintiffs' claims.

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for Plaintiffs conferred via email and telephone with counsel for Federal Defendants prior to filing this motion, and Federal Defendants oppose the relief requested herein.

Respectfully submitted on this 28th day of June, 2024,

*/s/ Elise Pautler Bennett*
ELISE PAUTLER BENNETT
Florida Bar No. 106573
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
Telephone: (727) 755-6950
Fax: (520) 623-9797
Email: ebennett@biologicaldiversity.org

*/s/ Ragan Edward Whitlock*
RAGAN EDWARD WHITLOCK
Florida Bar No. 1034177
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Telephone: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Nokuse Education, Inc.*