**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Jacksonville Division**

CENTER FOR BIOLOGICAL DIVERSITY
and NOKUSE EDUCATION, INC.,

     *Plaintiffs*,

        v.

U.S. FISH AND WILDLIFE
SERVICE; MARTHA WILLIAMS,
in her official capacity as Director
of the U.S. Fish and Wildlife Service;
and DEBRA HAALAND, in her official
capacity as Secretary of the U.S.
Department of the Interior,

     *Defendants*.

**Case No. 3:23-cv-936-WWB-LLL**

## PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY AND NOKUSE EDUCATION, INC.'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT, DECLARATORY AND PERMANENT INJUNCTIVE RELIEF REQUESTED

# TABLE OF CONTENTS

MOTION FOR SUMMARY JUDGMENT ........................................................................ 1

MEMORANDUM OF LAW ........................................................................................... 1

LEGAL FRAMEWORK ............................................................................................... 2

FACTUAL BACKGROUND .......................................................................................... 4

    I.    The declining Tortoise and its ongoing threats ................................................ 4

    II.   The Tortoise's protracted wait for complete protection .................................... 6

    III.  FWS's status review process.......................................................................... 6

    IV.  FWS's listing Denial for the Tortoise............................................................. 10

STANDARD OF REVIEW ........................................................................................... 11

ARGUMENT............................................................................................................... 12

    I.    FWS relied on a population model that arbitrarily disregarded the best available science regarding the Tortoise's life history and threats. .................................... 12

        a.    FWS's Denial disregarded the best available science regarding the Tortoise's life history. ................................................................................. 12

            i.    The PVA model's attempt to model immigration resulted in arbitrary and unexplained population growth that is contrary to the best available science regarding Tortoise life history. ................................. 12

            ii.   The PVA Model's approach to modeling maturation rate between juvenile and adult Tortoises is contrary to the best available science regarding Tortoise life history and viability modeling. ......................... 16

        b.    FWS's Denial disregarded the best available science regarding threats to the Tortoise. ........................................................................................... 17

    II.   FWS unlawfully concluded that the Tortoise is not endangered or threatened in a significant portion of its range. .......................................................................... 20

        a.    FWS applied a legally impermissible interpretation of "significant." ............ 20

        b.    FWS failed to rationally explain why Units 1 and 2 do not implicate the Tortoise's "viability." ................................................................................... 24

    III.  FWS failed to rationally explain its choice to limit the foreseeable future analysis to 80 years....................................................................................................... 27

IV.   FWS failed to consider the inadequacy of regulatory mechanisms. ...................29

REMEDY ................................................................................................................ 30

CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Am. Wildlands v. Norton*,
  193 F. Supp. 2d 244 (D.D.C. 2002) ................................................. 3

*BBX Capital v. Fed. Deposit Ins. Corp*,
  956 F.3d 1304 (11th Cir. 2020) .................................................. 11

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) .................................................. 30

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984) ................................................................ 21

*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971) ................................................................ 30

*Colo. River Cutthroat Trout v. Salazar*,
  898 F. Supp. 2d 191 (D.D.C. 2012) ............................................ 29

*Columbia Falls Aluminum Co. v. EPA*,
  139 F.3d 914 (D.C. Cir. 1998) .................................................. 16

*Ctr. for Biological Diversity v. Jewell,*
  248 F. Supp. 3d 946 (D. Ariz. 2017) ..................................... 21, 23

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  488 F. Supp. 3d 1219 (S.D. Fla. 2020) .................................. 17, 27

*Defs. of Wildlife v. Babbitt*,
  958 F. Supp. 670 (D.D.C. 1997) ................................................. 3

*Defs. of Wildlife v. Jewell*,
  176 F. Supp. 3d 975 (D. Mont. 2016) ......................................... 25

*Defs. of Wildlife v. Norton*,
  258 F.3d 1136 (9th Cir. 2001) .............................................. 21, 22

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
  733 F.3d 1106 (11th Cir. 2013) ................................................ 28

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*,
  584 F. Supp. 3d 812 (N.D. Cal. 2022) ....................................... 26

*Desert Survivors v. U.S. Dep't of the Interior,*
  321 F. Supp. 3d 1011 (N.D. Cal. 2018) .................................. 21, 23

*Desert Survivors v. U.S. Dep't of the Interior*,
  336 F. Supp. 3d 1131 (N.D. Cal. 2018) ...................................... 22

*Desert Survivors v. U.S. Dep't of the Interior*,
  No. 20-cv-06787-JSC, 2022 U.S. Dist. LEXIS 87794
  (N.D. Cal. May 16, 2022) .................................................. 21, 24

*Fla. Key Deer v. Paulison*,
  522 F.3d 1133 (11th Cir. 2008) ........................................................................ 2

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ....................................................................................... 12

*Fund for Animals v. Rice*,
  85 F.3d 535 (11th Cir. 1996) .......................................................................... 11

*Greater Yellowstone Coal. v. Servheen*,
  665 F.3d 1015 (9th Cir. 2011) ........................................................................ 28

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ............................................................................. 11, 22

*Miccosukee Tribe of Indians v. United States*,
  566 F.3d 1257 (11th Cir. 2009) ...................................................................... 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................... 2, 11, 16, 17, 18, 20, 24, 27, 28

*Nat'l Ass'n for Surface Finishing v. EPA*,
  795 F.3d 1 (D.C. Cir. 2015) ........................................................................... 16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  184 F. Supp. 3d 861 (D. Or. 2016) ................................................................ 26

*NRDC v. EPA*,
  38 F.4th 34 (9th Cir. 2022) ............................................................................. 25

*NRDC v. Rauch*
  244 F. Supp. 3d 66 (D.D.C. 2017) ................................................................. 16

*Or. Nat. Res. Council v. Daley*,
  6 F. Supp. 2d 1139 (D. Or. 1998) .................................................................. 29

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) .......................................................................... 17

*Sw. Ctr. for Biological Diversity v. Babbitt*,
  215 F.3d 58 (D.C. Cir. 2000) .......................................................................... 17

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ......................................................................................... 2

*United Food and Commer. Workers Union Local 571 v. Brown Grp.*,
  517 U.S. 544 (1996) ................................................................................. 22, 23

**Statutes**

5 U.S.C. § 706 ......................................................................................... 11, 22

5 U.S.C. § 706(2)(A) .................................................................................... 30

16 U.S.C. § 1531(b) ....................................................................................... 2

16 U.S.C. § 1532(16) ............................................................................................... 3

16 U.S.C. § 1532(20) ........................................................................................... 3, 21

16 U.S.C. § 1532(6) ............................................................................................. 3, 21

16 U.S.C. § 1533 ................................................................................................. 3, 26

16 U.S.C. § 1533(a)(1) ............................................................................................. 3

16 U.S.C. § 1533(a)(1)(D) ................................................................................... 29, 30

16 U.S.C. § 1533(b)(1)(A) ....................................................................... 3, 16, 17, 24, 27

16 U.S.C. § 1533(b)(1)(B) ....................................................................................... 30

16 U.S.C. §§ 1533–1540 ............................................................................................ 2

## Regulations

50 C.F.R. § 424.11(c) ................................................................................................ 3

50 C.F.R. § 424.11(d) ............................................................................................. 27

## Rules

Fed. R. Civ. P. 56 ..................................................................................................... 1

## Federal Register

52 Fed. Reg. 25376 (July 7, 1987) ........................................................................ 2, 6

61 Fed. Reg. 4722 (Feb. 7, 1996) ............................................................................. 3

68 Fed. Reg. 15100 (Mar. 28, 2003) ....................................................................... 29

76 Fed. Reg. 45130 (July 27, 2011) ...................................................................... 2, 6

87 Fed. Reg. 61834 (Oct. 12, 2022) .................................................................... 2, 30

**TABLE OF ADMINISTRATIVE RECORD CITATIONS**

| Document | AR Bates Range | Brief Page Nos. |
|---|---|---|
| U.S. Fish and Wildlife Service, Federal Register Notice of Review for the Gopher Tortoise (Nov. 16, 2020) | 002911-002963 | 6 |
| U.S. Fish and Wildlife Service, Gopher Tortoise Species Status Assessment (SSA) Report (Aug. 2021) | 003300-003587 | 1, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 17, 18, 19, 22, 23, 24, 25, 27, 28, 29 30 |
| U.S. Fish and Wildlife Service, Summary of Comments from Peer and Partner Review of Gopher Tortoise SSA (Aug. 2021) | 003588-003630 | 6, 18., 19, 20, 28 |
| U.S. Fish and Wildlife Service, Federal Register Notice FWS-R4-ES-2009-0029-0069 (Oct. 12, 2022) | 003657-003691 | 2, 9, 10, 11, 12, 15, 16, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30 |
| Justin D. Congdon et al., *Delayed Sexual Maturity and Demographics of Blanding's Turtles (Emydoidea blandingii): Implications for Conservation and Management of Long-Lived Organisms*, 7(4) Conserv. Biol. 826–833 (1993) | 004966-004974 | 6, 14 |
| Gopher Tortoise Council (GTC), Gopher Tortoise Minimum Viable Population and Minimum Reserve Size Working Group Report (July 24, 2013) | 008022-008028 | 4, 18, 28 |
| U.S. Fish and Wildlife Service, Range-Wide Conservation Strategy for the Gopher Tortoise (May 2013) | 008107-008128 | 28 |
| Gopher Tortoise Council (GTC), Gopher Tortoise Minimum Viable Population and Minimum Reserve Size Working Group Report II (Oct. 1, 2014) | 008730-008736 | 4, 18, 28 |
| Brian Folt et al., *Using predictions from multiple anthropogenic threats to estimate future population persistence of an imperiled species*, 36 Global Ecol. and Conserv. e02143 (2022) | 011116-011136 | 9, 13, 14, 15 |

| | | |
|---|---|---|
| Bruce E. Kendall et al, *Persistent problems in the construction of matrix population models*, 406(24) Ecol. Model. 33–43 (2019) | 011784-011794 | 17 |
| Letter from Center for Biological Diversity to U.S. Fish and Wildlife Service re: Updated Information Regarding the Eastern Population of Gopher Tortoise (*Gopherus polyphemus*) and Candidate Conservation Agreement (Sept. 3, 2021) | 012240-012249 | 30 |
| Letter from Center for Biological Diversity to U.S. Fish and Wildlife Service re: Updated Information Regarding the Eastern Population of Gopher Tortoise (*Gopherus polyphemus*) and Florida's Existing Regulatory Mechanisms (Nov. 30, 2021) | 012423-012426 | 30 |
| U.S. Fish and Wildlife Service staff email exchange regarding correspondence from Center for Biological Diversity providing updated information on the Eastern Population of Gopher Tortoise (Nov. 30 – Dec 1, 2021) | 012427-012429 | 30 |

## MOTION FOR SUMMARY JUDGMENT

Plaintiffs Center for Biological Diversity (Center) and Nokuse Education, Inc. (Nokuse) move this Court to grant summary judgment in their favor. Fed. R. Civ. P. 56. As explained in the memorandum below, Defendants U.S. Fish and Wildlife Service; Martha Williams, in her official capacity as Director of the U.S. Fish and Wildlife Service; and Deb Haaland, in her official capacity as Secretary of the U.S. Department of the Interior (collectively, FWS) violated the Endangered Species Act (ESA) and Administrative Procedure Act (APA) by unlawfully and arbitrarily determining that the gopher tortoise (Tortoise) does not warrant ESA protection. Plaintiffs respectfully request that the Court: (1) declare that FWS violated the ESA and APA; and (2) vacate FWS's decision and remand it for a new decision that complies with the ESA and APA.

## MEMORANDUM OF LAW

Gopher tortoises form the ecological backbone of southeastern upland pine forests, supporting more than 360 other species. AR_003341. But despite their critical importance, Tortoises have been steadily disappearing from the landscape, AR_003303; AR_003439, as their longleaf pine habitat has been whittled away to roughly 3% of its former extent, AR_003347. FWS has found that less than a quarter of current Tortoise populations are highly likely to persist in the future, while more than half are highly vulnerable. AR_003417–19. In the future, FWS projects that continued threats will cause "exacerbated" declines, causing the loss of 28–33% of Tortoises and 67–70% of Tortoise populations by 2100, AR_003458–59.

Recognizing that these ongoing declines and unmitigated threats are driving the Tortoise toward extinction, more than a decade ago, FWS determined that the Tortoise

1

warranted protection as threatened under the ESA. 52 Fed. Reg. 25376 (July 7, 1987); 76 Fed. Reg. 45130 (July 27, 2011). However, in 2022, despite overwhelming scientific information indicating the Tortoise is *still* at risk of extinction, FWS reversed course and denied ESA protections to the vast majority of them. 87 Fed. Reg. 61834 (Oct. 12, 2022); AR_003657–91 (Denial). This decision defies common sense and violates the ESA and APA by arbitrarily disregarding the best available science concerning the species' life history and threats and departing from the ESA's basic requirements.

Congress has commanded FWS to "halt and reverse the trend toward species extinction." *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008) (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978)). And, as with all administrative agencies, FWS must employ rational decisionmaking that "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action," so that the public and the Court can determine whether it has complied with this Congressional mandate. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Because FWS's Denial violates the ESA and is otherwise arbitrary and unlawful, the Court should vacate it and remand to FWS for a rational decision that complies with the ESA and APA.

## LEGAL FRAMEWORK

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Hill*, 437 U.S. at 180. Finding that "the value of endangered species [is] 'incalculable'," *id.* at 187, Congress committed to "provide a program for the conservation" of these species and the habitat they need to survive and recover, 16 U.S.C. § 1531(b). *See generally id.* §§ 1533–1540.

The ESA directs FWS to determine whether species are "threatened" or "endangered." *Id*. § 1533. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

When determining whether a species is endangered or threatened, FWS must assess five factors: "(a) the present or threatened destruction, modification, or curtailment of . . . habitat or range; (b) overutilization for commercial, recreational, scientific, or educational purposes; (c) disease or predation; (d) the inadequacy of existing regulatory mechanisms; [and] (e) other natural or manmade factors affecting [the species'] continued existence." 16 U.S.C. § 1533(a)(1). FWS must list a species if it is at risk from "any one or a combination of" these factors. 50 C.F.R. § 424.11(c).

FWS must also base listing decisions "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Requiring FWS to use the best available science, as opposed to scientific certainty, "is in keeping with congressional intent" that FWS "take preventative measures *before* a species is 'conclusively' headed for extinction." *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 679–80 (D.D.C. 1997); *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 251 (D.D.C. 2002).

Under the ESA, the term "species" also includes "any distinct population segment of any species of vertebrate fish or wildlife." 16 U.S.C. § 1532(16). Therefore, if a species is not endangered or threatened throughout all or a significant portion of its range, FWS must list a distinct population segment (DPS) that is (1) discrete; (2) significant; and (3) endangered or threatened. 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

## FACTUAL BACKGROUND

I.    **The declining Tortoise and its ongoing threats**

The Tortoise (*Gopherus polyphemus*) is a large terrestrial turtle with elephantine hind feet and shovel-like forelimbs, which it uses to dig deep burrows in the sandy soils of upland pine forests across the American Southeast. AR_003324; AR_003327. These burrows are central to the Tortoise's survival, and they also support more than 360 other species by providing shelter and other critical resources. AR_003341.

The Tortoise requires sufficient areas of pine forests with widely spaced trees and an open canopy, which allows sunlight to reach the forest floor, where it can warm basking Tortoises and stimulate the growth of a diverse array of grasses, herbs, and fruits for them to feed on. AR_003339–40. The Tortoise also requires well-drained soils that are free of leaf litter for burrowing and nesting. AR_003340. This habitat depends on frequent natural disturbance, primarily from fire, for its natural structure and health. AR_003341. Well-managed habitat is so important to the Tortoise's survival that experts have determined that a viable Tortoise population requires at least 247 acres of superb, well-managed habitat. AR_008730; AR_008024; AR_003339.

Historically, the Tortoise ranged across the Southeast's longleaf pine forests, which once spanned an estimated 92 million acres, AR_003346–47; but now, only 3% of these forests remain. *Id.* As the longleaf pines declined, the Tortoise's ability to survive also "decreased significantly." AR_003439. One of the primary threats to the Tortoise's survival is habitat destruction and fragmentation driven by urban and agricultural uses, as well as habitat degradation driven by fire suppression and invasive species. AR_003348–49; AR_003368 (ranking "habitat destruction and lack of habitat management (e.g., no prescribed fire program) as the top two major threats to the

gopher tortoise"). With "[p]rivately owned lands account[ing] for approximately 80 percent of potential gopher tortoise habitat," FWS has found that forests "are particularly susceptible to fragmentation and land-use conversion," especially as "the human population continues to grow in the Southeast, [and] development and related socioeconomic pressures . . . increas[e]." AR_003394. The majority of the Tortoise's remaining habitat receives no conservation management. AR_003325; AR_003352. One study projects a "20 percent loss" of habitat "by 2060 due solely to people immigrating into Florida." AR_003359. Meanwhile, the associated, growing network of roads threatens the Tortoise by fragmenting and isolating habitat, preventing Tortoise immigration (and genetic flow) between populations, and increasing road deaths from vehicles. AR_003353–56; AR_003354. "This threat is ongoing and will continue to occur in the future in peninsular Florida and urban centers in [other states]." AR_003355.

Lack of frequent habitat management with natural or "prescribed" fire is also a major threat to the Tortoise. AR_003368. The "[l]oss and alteration of . . . habitat from fire exclusion or fire suppression has a significant effect on survival of gopher tortoises," AR_003370, including "life expectancy decline[s]" and "population reduction," AR_003371 (finding lack of fire "reduce[d] a . . . population by 100 percent in 16 years"). Other threats include sea level rise and extreme weather, AR_003356–57, which threaten the Tortoise directly through habitat destruction and degradation (flooding and preventing natural fire), AR_003357–58, and indirectly as human populations move away from the coasts and into currently undeveloped lands, AR_003359. The Tortoise is also susceptible to disease, AR_003359–62; persecution by people, AR_003349; predation, AR_003362–64; and exotic, invasive species, AR_003365; AR_003367.

One "challenge[] for conservation" for the Tortoise is its life history traits: late age of reproductive maturity (12–20 years), low reproductive output (4–8 eggs per clutch), low juvenile and hatchling survival (approximately 13% survival), and long lifespan (50–80 years). AR_003326; AR_003363. "[L]ong-lived organisms" like the Tortoise have "severe constraints on the ability of populations to respond to chronic disturbances" like mortality, AR_004968; AR_004973, and there are "long delays" before a population can rebound. AR_004973. These traits can also mask population declines until it is too late to recover them. "[B]ecause tortoises are long-lived and can survive (but probably have limited or no recruitment) in poor habitat, it is possible that some populations currently with 50, 100, or even >250 adults could not persist in the future." AR_003601.

## II.    The Tortoise's protracted wait for complete protection

Despite a documented history of declines and growing threats, the Tortoise has been waiting for rangewide ESA protection for decades. In 1987, FWS first listed Tortoises as threatened in the small, western part of their range. 52 Fed. Reg. 25376. Then, in 2011, FWS determined that listing Tortoises in the east was "warranted" but delayed protections because of "higher priority actions." 76 Fed. Reg. 45130. FWS observed that Tortoise "habitat is diminishing and that populations are declining" and the "primary threat . . . is from habitat destruction and modification." *Id.* at 45154. As recently as 2020, FWS affirmed that the Tortoise warranted listing across its range. AR_002912. Yet the Tortoise continued to wait for protection until the Center and FWS agreed that FWS would make a final decision by September 30, 2022. AR_003657.

## III.    FWS's status review process

To review the Tortoise's biological status, FWS prepared a Species Status Assessment Report (SSA), which it intended to "compile[] the best available information

and data regarding the species' biology and factors that influence the species' viability"
and to "serve as the scientific document that informs future agency decisions for this
species." AR_003318; AR_003301 (listing SSA preparers). The SSA "is not a decisional
document by [FWS]; rather, it provides a review of available information strictly related
to the biological status of the gopher tortoise." AR_003318. FWS defined "viability" as
the Tortoise's "ability . . . to sustain populations in the wild over time." AR_003319. To
assess current viability, the SSA analyzed the "3Rs"—the Tortoise's resiliency (ability to
withstand varying environmental conditions from year to year), redundancy (ability to
withstand catastrophic events), and representation (ability to adapt to changing
conditions through genetic, phenotypic, and ecological diversity). AR_003319–21. FWS
then delineated 656 "local populations" across the Tortoise's range, AR_003409, which
it defined as groups of tortoises readily accessible to one another for the purposes of
reproduction, AR_003303. FWS then grouped the local populations into 253 "landscape
populations," AR_003409, representing sets of local populations that are in close
enough proximity to allow occasional movement of Tortoises among them. AR_003303.

  FWS next divided the populations into five "representative units," based on a
genetic study (Gaillard et al. 2017); regions defined by unique geology, topography, and
ecological communities; and species-expert input. AR_003411–12. These units closely
tracked "genetic regions" identified by Gaillard et al. (2017) and were named Western
(Unit 1), Central (Unit 2), West Georgia (Unit 3), East Georgia (Unit 4), and Florida (Unit
5). AR_003413 (map of analysis units); AR_003412 (map of genetic regions from
Gaillard et al. (2017)). FWS intended for the units to "refer[] to the breadth of genetic

7

and environmental diversity within and among populations, which influences the ability of a species to adapt to changing conditions over time." AR_003410–13.

To determine the Tortoise's current viability, FWS first assessed each of the 656 populations' resiliency. AR_003413–14. After recognizing that a population's resiliency depends on a number of factors, including population size, population density, genetic exchange, and habitat quality and quantity, AR_003414, FWS analyzed resiliency solely in terms of Tortoise abundance (number of tortoises in a population), designating populations of 250 or more Tortoises as "high resiliency," 51–249 Tortoises as "moderate resiliency," and less than 50 Tortoises as "low resiliency." AR_003416–17. FWS found that *only 19%* (127 populations) are "high resiliency" and thus "highly likely to persist through a biologically appropriate time frame." AR_003417–19. On the other hand, more than half (55%; 360 populations) are "low resiliency" and thus "highly vulnerable to stochastic disturbances." *Id*. The other 26% (69 populations) were "moderate resiliency" and "more vulnerable" than high resiliency populations. *Id*. FWS also analyzed the current condition of each of the analysis units.

FWS evaluated representation "by examining the number of populations and their associated resiliency within the five population analysis units across the species' range,"[1] and it evaluated redundancy as "the total number and resiliency of populations and their distribution within and among representative units." AR_003439. FWS concluded that, "[d]ue to loss of open pine conditions, gopher tortoise representation and redundancy have likely decreased significantly from historical levels." AR_003440.

---

[1] FWS found that resiliency for most populations in Unit 1 (89%; 94 of 106) was low, while only 2% (2 of 106) was high, AR_003418; and resiliency for most populations in Unit 2 (67%; 71 of 106) was low, and only 8% (8 of 106) was high. AR_003419.

To predict the Tortoise's viability in the future, FWS used a rangewide population viability model (PVA model), AR_003442–73, which applied a methodology from a model published by Folt et al. (2022), AR_011116–36.[2] *See* AR_003678 (FWS explaining that Folt et al. (2022) "uses a very similar methodology to the future condition analysis in the SSA"). The PVA model is intended to predict population size and extinction risk for the Tortoise for 80 years (from 2021 to 2100) using a female-only model with two discrete life stages: juveniles and adults. AR_003442; AR_003560–66. The PVA model analyzed how the 656 local populations and 253 landscape populations would be influenced by four threats that "have significant current and future effects on gopher tortoise populations": climate warming, sea-level rise, urbanization's effects on tortoise immigration and habitat management, and climate-change effects on habitat management. AR_003469; AR_003448–54. The PVA model then described six scenarios that represent various combinations of the threats and varying management responses. AR_003550. Once analyzed, FWS summarized the conservation outlook for the Tortoise under each scenario by projecting extinction risk, average rangewide abundance, and number of extant populations at year 2100. AR_003455.

The PVA model predicted considerable population declines and local extinctions over the next 80 years. AR_003458–59. FWS projected that the current total population size will decline by 28–33% by 2100, and the number of local populations will decline by 68–70% by 2100. *Id.* FWS predicted that urbanization would "have a significant negative effect on persistence of local populations," particularly in "upland, high-

---

[2] Because the PVA model in the SSA and the model in Folt et al. (2022) are nearly identical, Folt et al. (2022) provides crucial insight into the PVA model.

elevation habitats." AR_003471. FWS also "observed particularly strong negative effects of . . . sea-level rise . . . on persistence probability," noting that "populations in low-elevation, coastal areas . . . might be doomed." *Id*. Yet FWS conceded that the PVA model did not reflect the majority of vulnerable Tortoise populations, instead "simulat[ing] the fate of known populations largely on protected, conservation lands" where populations have "greater demographic rates and persistence probabilities" when compared to the majority of populations that "may occur on lands lacking long-term protection from development." AR_003472.

## IV.    FWS's listing Denial for the Tortoise

On October 12, 2022, FWS determined that listing the Tortoise under the ESA is not warranted. AR_003657–91 (Denial). FWS found that the Tortoise was not endangered, concluding that its viability will be supported by a "sufficient quality and quantity of habitat" and "[t]he five genetic groups delineated across the species' range," which "provide adaptive capacity and sufficient species-level representation for the gopher tortoise." AR_003682. Relying on the PVA model, FWS also concluded that the Tortoise is not threatened, surmising that "the future condition of the species with relatively large numbers of individuals and populations suggests resiliency to withstand stochastic environmental and demographic change, and redundancy to buffer from future catastrophic events." AR_003682; AR_003681.

Next, FWS determined whether the Tortoise is endangered or threatened in a significant portion of its range. AR_003682–84. FWS identified Units 1 and 2 as a portion of the Tortoise's range that had lower resiliency and less habitat management, as well as projected declines that "would significantly increase the risk of extirpation" in those units from a catastrophic event. AR_003683. However, FWS found this portion

was not significant, AR_003683–84, despite containing *two* of the "five genetic groups" that "provide adaptive capacity and sufficient species-level representation," AR_003682.

FWS also considered whether any DPS of Tortoises warranted protection. AR_003684–91. It found that a Western DPS (Unit 1) and an Eastern DPS (Units 2–5) were discrete and significant, AR_003686–87, and protected the Western DPS as threatened, AR_003687–89, but not the Eastern DPS. AR_003689–91.

## STANDARD OF REVIEW

The APA provides the standard of review for ESA listing decisions. 5 U.S.C. § 706; *Fund for Animals v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). The APA "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (quoting 5 U.S.C. § 706). For "agency policymaking and factfinding," the APA directs courts to set aside agency actions, findings, or conclusions that are "arbitrary capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706. Although courts afford "deference . . . when the agency is making decisions within its area of special expertise," they "[n]evertheless . . . may find an agency action 'arbitrary and capricious where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *BBX Capital v. Fed. Deposit Ins. Corp*, 956 F.3d 1304, 1314–15 (11th Cir. 2020); *State Farm*, 463 U.S. at 43.

ARGUMENT[3]

**I.  FWS relied on a population model that arbitrarily disregarded the best available science regarding the Tortoise's life history and threats.**

FWS based its conclusion that "extinction risk . . . is low in the future" for the Tortoise on the outcome of the PVA model. AR_003682; *see* AR_003679–80 (Denial describing model). This reliance on the PVA model unlawfully departed from the best available science because it disregarded FWS's own scientific findings regarding the Tortoise's life history and failed to analyze direct threats from urbanization.

**a.  FWS's Denial disregarded the best available science regarding the Tortoise's life history.**

First, FWS reached an arbitrary and unlawful conclusion in its Denial by: (1) evaluating Tortoise immigration in manner that produced arbitrarily inflated population growth rates, contrary to Tortoise life history; and (2) failing to use the best available science to estimate the Tortoise's maturation rate, further inflating Tortoise survival.

> ***i.   The PVA model's attempt to model immigration resulted in arbitrary and unexplained population growth that is contrary to the best available science regarding Tortoise life history.***

Among other things, FWS's PVA model analyzed the effects of threats on Tortoise "immigration," which is the movement of Tortoises from one local population to another within a landscape population. AR_003446; *see also* AR_003303 (defining

---

[3] Plaintiffs have standing to bring this action under the ESA because their members' protectable scientific, professional, recreational, spiritual, and aesthetic interests in the survival and recovery of the Tortoise have been injured by FWS's unlawful decision challenged herein. *See* Declaration of George L. Heinrich (Ex. 1); Decl. of Matthew J. Aresco, Ph.D. (Ex. 2); Decl. of William P. Matturro (Ex. 3). These injuries are directly traceable to FWS's challenged action and are redressable by a favorable decision in this Court. *Id.*; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–84 (2000). Plaintiffs have associational standing to represent their members' interests. *See* Decl. of Tierra Curry (Ex. 4); *Laidlaw*, 528 U.S. at 181.

"local" and "landscape" population). However, the model produced illogical, unexplained results that conflict with FWS's own findings regarding Tortoise life history.

The best available science dictates that immigration within a landscape population is effectively a "zero-sum process" and should not lead to exponential population growth, as individuals added to one local population are removed from a different local population, resulting in no significant loss or gain of individuals across the landscape population. AR_003446 (explaining that immigration results in the loss of a Tortoise from one local population and a corresponding gain of a Tortoise in another). Yet the PVA model derived immigrants not from other local populations within the landscape population but from theoretical populations (i.e., populations that do not exist but are created for the model) assigned to each of the local populations. AR_011121 (explaining that "[t]he immigrant pool was calculated by dividing the total number of adult tortoises in adjacent populations (i.e., metapopulation size . . . ) by the number of nearby local populations"). Unlike actual landscape populations, the model "assumed that population growth of the [theoretical] landscape population term would change through time similarly to that of the local population being modeled." AR_003539. Thus, despite FWS's intent for theoretical populations to represent the actual pool of Tortoises available to immigrate within each landscape population, the model arbitrarily inflated the size of each theoretical population in sync with the growth of a single local population, *id.*, departing from FWS's definition of immigration as a process that should not result in a meaningful change in the landscape population. AR_003446.

This model design produced astonishing results, where the simple movement of Tortoises between populations (immigration) resulted in inexplicably divergent

outcomes, causing FWS to observe that Tortoise population growth and extinction risk over the 80-year simulations were "highly sensitive to input values for immigration rate." AR_003548. "For example, when immigration rate was high (4%), total rangewide population size *grew by 11%* on average; when immigration was set to zero, rangewide population size *decreased by 98%, virtually leading to extinction in 80 years*." AR_011129 (emphasis added). FWS failed to explain why immigration led to such substantial and divergent rangewide population changes when it admitted that movement into one population implies subtraction from another population. AR_003446.

Indeed, under a "very high immigration" scenario, the model projected the Tortoise's total population will *more than double*, growing from approximately 70,000 Tortoises to a staggering 150,000 Tortoises over the course of only 80 years. AR_003468; AR_003566, which is a biological impossibility for a species that is "long-lived, slow-growing, and . . . slow to reach maturity." AR_003473; AR_004973 (describing "long delays" for populations of long-lived species to grow). Meanwhile, under a "no immigration" scenario, the model projected that the total population size will decrease from roughly 70,000 Tortoises to 1,500 Tortoises over the same period, AR_003468; AR_003566, "virtually leading to extinction in 80 years," AR_011129. FWS has provided no rational explanation for these notably divergent results, where modeling the simple movement of Tortoises between populations produced rapid population growth that departs from the best available science FWS's own conclusions regarding the Tortoise's life history, which is marked by slow individual and population growth.

These illogical results are only more glaring when comparing the results of the SSA's PVA model, AR_003523–59, to the results of the same model published in the

peer-reviewed paper Folt et al. (2022), AR_011116–36. Despite using the same model structure, the number of Tortoises projected to persist at the year 2100 in the SSA's PVA model (47,000 Tortoises), AR_003461, was more than double the number that is projected to persist in Folt et al. (2022) (19,000 Tortoises), AR_011133. The primary difference between the two models relates to data inputs: Folt et al. (2022) omitted very small populations (totaling roughly 100 Tortoises[4]), while the SSA included them. AR_003678 (explaining Folt et al. 2022 omitted populations smaller than 8 individuals).

When omitting these very small populations, a member of FWS's SSA team believed the difference of roughly 100 Tortoises should have resulted in no difference "because populations with 7 or fewer tortoises likely lack sufficient genetic diversity for long-term persistence." AR_011123; AR_003678 (FWS finding that "[p]opulations with seven or fewer tortoises likely lack sufficient genetic diversity to support sufficient long-term viability"). In other words, FWS anticipated that these very small populations were too small to persist through the PVA model simulation, and thus they should disappear over time. Yet FWS's PVA model resulted in *significantly more* Tortoises.[5]

One explanation for these results is that the arbitrary design of the theoretical populations created a positive feedback loop that caused these very small populations to grow exponentially, rather than disappear. But FWS failed to provide *any* explanation for how an output difference of approximately 28,000 Tortoises could have resulted from an input difference of only 100 Tortoises between two otherwise identical models.[6]

---

[4] The SSA model started with approximately 70,600 Tortoises, AR_003458, while Folt et al. (2022) started with approximately 70,500, AR_011123.

[5] *Compare* AR_003461 (SSA model results) *with* AR_011133 (Folt et al. (2022) results).

[6] FWS did not disclose the population-specific outputs for model, which would have allowed the Court to trace the intervening steps that led from the model's inputs to its

Puzzlingly, FWS downplayed it as a "slight variation in the published model [that] did not substantively change the consideration in [FWS's] analyses." AR_003678.

Thus, FWS's Denial is legally deficient where it relied on a PVA model that departed from the best available science. *See* 16 U.S.C. § 1533(b)(1)(A). It is also arbitrary where "that model bears no rational relationship to the reality it purports to represent" and where FWS has failed to "provide a full analytical defense" in the record. *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (internal quotation marks omitted) (finding EPA's continued reliance on an inadequate model as a means of determining compliance with a water-treatment standard was arbitrary); *NRDC v. Rauch*, 244 F. Supp. 3d 66, 94 (D.D.C. 2017) (*quoting Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 18 (D.C. Cir. 2015)) (explaining that "even in the most technical cases, the Service must still 'provide[] a complete analytic defense' of its assumptions and methodology'"). The "process by which [an agency] reaches [its] result[s] must be logical and rational." *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998); *State Farm*, 463 U.S. at 43; *see Rauch*, 244 F. Supp. 3d at 89 (finding an agency had "either committed the logical error that Plaintiffs have identified or, at the very least, . . . failed to explain why it has not done so"). Because FWS failed to provide a rational explanation, the Denial is unlawful and should be vacated and remanded.

>    ii.   **The PVA Model's approach to modeling maturation rate between juvenile and adult Tortoises is contrary to the best available science regarding Tortoise life history and viability modeling.**

FWS's PVA model also departed from the best available science when modeling Tortoise maturation rates. FWS employed a "flat-age-within-stage" approach for

---

results. Without this information, FWS did not—and indeed cannot—"articulate [the] satisfactory explanation" required by the APA. *State Farm*, 463 U.S. at 43.

estimating juveniles that are eligible to transition to the adult stage each year, assuming that all individuals in the juvenile stage "have an equal probability . . . of transitioning to the adult state." AR_003528. Yet science before the agency in a published study by Kendall et al. (2019) explained that this approach "substantially over[-]estimated" population growth rates, AR_011790, and offered alternative approaches that accurately approximate Tortoise population growth, including an "unrolled" method,[7] AR_011784– 94, which is "strongly preferred" to FWS's "stage structured" approach. AR_011793.

FWS must rely on the best available science when making ESA listing decisions, 16 U.S.C. § 1533(b)(1)(A), and it "may not disregard available scientific evidence that is in some way better than the evidence [it] relies on." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 488 F. Supp. 3d 1219, 1227 (S.D. Fla. 2020) (cleaned up) (vacating and remanding a listing decision where there was "a missing explanatory link between FWS's exclusive reliance" on outdated data when the agency had other, more current data); *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). Here, FWS failed to explain why it chose a method that substantially over-estimated population growth rate, AR_011790, when it had science that provided a more accurate method, AR_011784–94. *State Farm*, 463 U.S. at 43.

**b.    FWS's Denial disregarded the best available science regarding threats to the Tortoise.**

FWS's reliance on the PVA model was also arbitrary and contrary to the best available science because it ignored direct threats from urbanization, one of the primary

---

[7] This method models juvenile mortality over multiple age classes, rather than one juvenile stage, to capture high mortality for each year in the juvenile stage. AR_011793.

threats to the species.[8] AR_003348–49; AR_003368. In the SSA, FWS found that development and urbanization "threaten gopher tortoise populations" by "direct loss of habitat," AR_003348; AR_003349, as well as by disrupting habitat connectivity, disrupting habitat management activities like prescribed fire, increasing road mortality, increasing human persecution, increasing predation from domestic animals like cats and dogs, and in some portions of the tortoise's range, causing direct mortality when developers entomb tortoises in their burrows, AR_003349. Although the PVA model purported to model threats from "[h]uman development of the landscape (i.e., urbanization)," AR_003451, it only modeled a small subset (two) of the many threats FWS identified in the SSA: "habitat management . . . with prescribed fire" and "immigration rates of gopher tortoises across landscape populations," AR_003451. Most notably, despite recognizing that direct loss of habitat is the primary threat from urbanization, FWS did not model it and did not otherwise account for the threat in its analysis of the tortoise's future condition in the SSA or its analysis of the Tortoise's

---

[8] FWS's entire viability analysis ignored habitat threats. Relying on minimum population viability guidelines established in Gopher Tortoise Council (2013), FWS defined a "high" resiliency population as 250 or more adult gopher tortoises. AR_003416. But as FWS acknowledged throughout the record, the guidelines defined a viable tortoise population as "consisting of at least 250 adult tortoises . . . *on a property with at least [247 acres] of high quality, well-managed tortoise habitat.*" AR_003339 (emphasis added); AR_003415 (finding that "at least 247 acres . . . of high quality, managed habitat was required for a population to persist"); AR_008730 (requiring "superb habitat"); AR_008024 (finding a population "can persist . . . provided the site receives intensive [habitat] management"). By failing to consider habitat size and quality—prerequisites to viability—FWS ignored the best available science and "entirely failed to consider an important aspect of the problem.'" *State Farm*, 463 U.S. at 43; *see* AR_003601 (reviewer asking for "some justification" for failing to include habitat suitability in modeling). This renders unlawful FWS's finding that there are "sufficient number of populations with high or moderate resiliency." AR_003681–82; AR_003675–76.

status in the Denial. *See generally* AR_003469–73 (summarizing future condition and viability in the SSA); AR_003682 (relying primarily on the PVA model in the Denial).

FWS likely failed to consider the direct loss of habitat and other threats from urbanization because the PVA model arbitrarily focused on Tortoise populations *that are not at risk from development*.[9] Even though the majority of the tortoise's habitat (80% or more) occurs on private lands, AR_003394, AR_003667, where Tortoise populations have "demographic rates [that] are likely reduced relative to populations on conservation lands," AR_003472, the PVA model instead focused "largely on protected, conservation lands" where tortoise populations have "greater . . . persistence probabilities" because they are not directly at risk from development, AR_003472; AR_003530 (explaining that "[m]ost population estimates came from assessments of local populations on lands managed for . . . conservation"). Even a peer reviewer solicited by FWS observed that because "the modeled populations were often on conservation lands managed for natural resources, . . . we wouldn't expect populations

---

[9] FWS's Denial also used analytical sleight of hand to arbitrarily discount the significant and worsening threat from habitat destruction. Despite finding that "[t]he best available information . . . indicates that habitat loss, degradation, and fragmentation . . . are the most significant factors influencing gopher tortoise viability," AR_003302; AR_003672, FWS's Denial concluded that "sufficient quality and quantity of habitat remains to provide adequate resiliency to contribute to the viability of the species," AR_003682. Yet, FWS failed to define what quality or quantity is "sufficient," nor did it cite any reliable data to support its conclusion. Although the Denial cited a Habitat Suitability Index published by Crawford et al. (2020), AR_003658, FWS explained that it "decided against using the habitat suitability model," AR_003601, because it "could not reliably determine estimates of habitat within all populations across the range of the gopher tortoise," AR_003423. Thus, FWS asserted, "[e]stimates of habitat were not used to assess resiliency of gopher tortoise populations." AR_003676 (Denial); AR_003423–24 (SSA). Consequently, FWS did not—and could not—rationally rely on the habitat estimates from Crawford et al. (2020) to conclude that there is "sufficient quality and quantity of habitat . . . to contribute to the viability of the species." AR_003682.

not included in the analysis to have higher likelihoods of persistence in the future (and would probably expect risk to be higher)." AR_003602. After conceding that the model did not represent the vulnerable status of the vast majority of Tortoise populations, FWS proceeded to rely on it—without otherwise accounting for the vulnerable populations on private lands—to conclude that "the extinction risk for the gopher tortoise is low in the future." AR_003682. By failing to model the full range of threats from urbanization or otherwise consider those threats in its decision, FWS "entirely failed to consider an important aspect of the problem," rendering its decision arbitrary and capricious. *State Farm*, 463 U.S. at 43; *see Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1275 (11th Cir. 2009) (finding unlawful FWS's failure to measure take of ESA-listed birds in numbers of individual birds where FWS had data providing annual bird counts).[10]

## II.    FWS unlawfully concluded that the Tortoise is not endangered or threatened in a significant portion of its range.

FWS also unlawfully denied the Tortoise protection based on its status in a significant portion of its range (SPR), AR_003682–84, where it applied an unlawful interpretation of "significant" and failed to rely on the best available science.

### a.    FWS applied a legally impermissible interpretation of "significant."

As a preliminary matter, FWS's rationale for its Denial for the Tortoise is legally deficient where its interpretation of "significant" required the portion to be so important to

---

[10] The same legal and logical flaws also undermine FWS's Denial for the Eastern DPS. AR_003689 (Denial explaining that "discussion of threats and the species' response to those threats in *Status Throughout All of Its* Range may be applied to the Eastern DPS as well"). Additionally, FWS's determination that conservation efforts "have contributed to the improved condition of the species," AR_003690, contradicts FWS's finding a mere page before that less than 20% of populations in the Eastern DPS exhibit high resiliency, AR_003689, and that the DPS "is projected to decrease in number of local and landscape populations in the future," *id.* The Eastern DPS cannot rationally have both an "improved" condition and face continued projected declines.

the species' existence that it would render the species endangered or threatened across its entire range. The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all *or a significant portion of its range*." 16 U.S.C. § 1532(6) (emphasis added). Likewise, a "threatened" species is one that is "likely to become an endangered species within the foreseeable future throughout all *or a significant portion of its range*." *Id.* § 1532(20) (emphasis added). It plainly follows that the Tortoise must be listed in either of two scenarios: (1) when it meets the definition of endangered or threatened "throughout all" its range; *or* (2) when it meets the definition of endangered or threatened in a "significant portion of its range." *Id.* § 1532(6), (20).

Courts have repeatedly struck down interpretations of the term "significant" where it "result[ed] in a threshold under the 'significant portion of its range' definition that [was] functionally equivalent to the threshold under the 'throughout all' definition." *Desert Survivors v. U.S. Dep't of the Interior,* 321 F. Supp. 3d 1011, 1070, 1070–74 (N.D. Cal. 2018) (*"Desert Survivors I"*) (citing *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001)) (invalidating SPR definition where "the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be [endangered or threatened]"); *Desert Survivors v. U.S. Dep't of the Interior*, No. 20-cv-06787-JSC, 2022 U.S. Dist. LEXIS 87794, at *27 (N.D. Cal. May 16, 2022) (*"Desert Survivors II"*); *Ctr. for Biological Diversity v. Jewell,* 248 F. Supp. 3d 946, 958 (D. Ariz. 2017). Notably, the courts invalidated these interpretations despite the now-defunct *Chevron* framework requiring courts to defer to permissible constructions of ambiguous statutory provisions. *E.g.*, *Desert Survivors I*, 321 F. Supp. 3d at 1072 (applying deference pursuant to *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–843

(1984)). However, courts will no longer extend such deference and instead "will decide '*all* relevant questions of law.'" *Loper Bright*, 144 S. Ct. at 2261 (quoting 5 U.S.C. § 706). Because FWS's approach could not even pass muster as a permissible construction under *Chevron*, it surely cannot be sustained as the "best reading" of the statute as required by *Loper Bright. Id.* at 2251. As explained by the Ninth Circuit,

> Such a redundant reading of a significant statutory phrase is unacceptable. When interpreting a statute, we must follow a "natural reading . . . , which would give effect to *all* of [the statute's] provisions." *United Food and Commercial Workers Union Local 571 v. Brown Group, Inc.*, 517 U.S. 544, 549, 134 L. Ed. 2d 758, 116 S. Ct. 1529 (1996) (emphasis added). By reading "all" and "a significant portion of its range" as functional equivalents, the Secretary's construction violates that rule.

*Defs. of Wildlife v. Norton*, 258 F.3d at 1142. FWS conceded that such an interpretation "has been invalidated." AR_003683; *see Desert Survivors v. U.S. Dep't of the Interior*, 336 F. Supp. 3d 1131 (N.D. Cal. 2018) (nationwide vacatur of "significant" definition).

Yet again, for the Tortoise, FWS's interpretation read "all" and "significant portion of its range" as functional equivalents. When determining the collective significance of Units 1 (Western) and 2 (Central) in the Denial, FWS considered whether it "is significant based on its biological importance to the *overall viability of the gopher tortoise*." AR_003683 (emphasis added). According to FWS's "definition of viability . . . in the SSA," AR_003661, viability is "the ability of a species to sustain populations in the wild over time," AR_003319. In other words, "viability" refers to whether a species can "sustain populations" (exist) or "not sustain populations" (become extinct). FWS's interpretation further requires that the portion be biologically important to the viability "of the gopher tortoise," which refers to the species rangewide. AR_003657 (announcing "findings on the status of the gopher tortoise (*Gopherus polyphemus*) rangewide").

When reading these terms together, FWS's interpretation would only find Units 1 and 2 "significant" where they are: (1) biologically important; (2) to the existence; (3) of the species. Or put more succinctly, for the Tortoise to be endangered in an SPR, it would also have to be endangered throughout all of its range. This is an impermissible interpretation of "significant" because it "results in a threshold under the 'significant portion of its range' definition that is functionally equivalent to the threshold under the 'throughout all' definition," *Desert Survivors I,* 321 F. Supp. 3d at 1070–71, and the court must follow a "natural reading . . ., which would give effect to *all* of [the ESA's] provisions." *Brown Group*, 517 U.S. at 549 (emphasis added); *see also Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d at 956–957.

This unlawful interpretation is evident throughout FWS's analysis. For instance, FWS analyzed whether the portion may "contain habitat that is essential to a specific life-history function for the species," like feeding and breeding, "that is not found in the other portions." AR_003683; AR_003326–33 (explaining life history requirements). But if, for example, the Tortoise were endangered in the only portion of its range that contained breeding habitat, it would also be endangered throughout all of its range because it would be unable to breed if that portion were to become extinct. Because FWS relied on an unlawful interpretation of SPR to conclude that the Tortoise was not endangered or threatened, the Court must vacate and remand the Denial for FWS to make a new decision that complies with the ESA.[11]

---

[11] Likewise, FWS's analysis of the Eastern DPS's status in an SPR is also unlawful where FWS determined that Unit 2 was not significant after "consider[ing] whether the Unit . . . is significant based on its biological importance to the overall viability of the Eastern DPS." AR_003691; *see Desert Survivors I,* 321 F. Supp. 3d at 1070–74.

**b.    FWS failed to rationally explain why Units 1 and 2 do not implicate the Tortoise's "viability."**

Furthermore, aside from the unlawful conflation of the distinct legal bases for listing, FWS failed to adequately, or even coherently, explain why Units 1 and 2 do not bear sufficiently on the tortoise's "viability" to warrant a determination of significance. 16 U.S.C. § 1533(b)(1)(A); *State Farm*, 463 U.S. at 43. For example, in the SSA, FWS "focus[ed its] analysis on portions of the species' range that *contribute to the conservation of the species in a biologically meaningful way*," AR_003682 (emphasis added), and identified analysis Units 1 and 2 as portions fitting that description, AR_003683. This is consistent with FWS's finding that each of "the five delineated analysis units" (including Units 1 and 2) are "based primarily on genetic variation in gopher tortoises across the range of the species" that FWS "expect[s] . . . to be generally indicative of the inherent adaptive capacity of the gopher tortoise as a species." AR_003678; AR_003439 (explaining that "representation for this species is assessed primarily based on genetic variation across the range of the species (5 analysis units[)]"). Yet in the SPR analysis, FWS reached an arbitrary and inconsistent conclusion that the "portion comprising Units 1 . . . and 2 . . . does not represent a significant portion of the gopher tortoise's range," without explaining—or even mentioning—why the genetic variation is not significant. AR_003684; *Desert Survivors II*, 2022 U.S. Dist. LEXIS 87794, at *32–34 (finding FWS's SPR determination arbitrary where the agency "conceded that [a portion] ha[d] unique genetic characteristics, but simply dismissed that diversity"). FWS's determination is particularly arbitrary where it based its Denial for the species rangewide on the fact that "*[t]he five genetic groups delineated across the species' range provide adaptive capacity and sufficient species-*

24

*level representation for the gopher tortoise.*" AR_003682 (emphasis added); AR_003305 (finding that "[t]he spatial distribution of populations predicted to persist in the future *are distributed evenly among genetic analysis units*, which suggests the persistence of genetic representation in the future as well"); *see Defs. of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1005–06 (D. Mont. 2016) (remanding listing decision for wolverine where FWS "brushed the small population size/low genetic diversity issue aside").

Instead, FWS discounted Units 1 and 2 by concluding that they "do not constitute a large geographic area relative to the remaining portion of the range," do not contain "high quality habitat," and do not contain habitat that "is essential to a specific life history function for the species that is not found in the remainder of the range."[12] AR_003684. With regard to size and quality of habitat, if FWS's metric for significance is viability—as it claims—then FWS's own conclusion that "these units contribute to the rangewide representation and redundancy of the gopher tortoise," should end the analysis in favor of significance. AR_003684; AR_003319–21 (characterizing viability in terms of the 3Rs). Likewise, FWS's conclusion doubting the quality of the habitat in Units 1 and 2, AR_003684, is contrary to its own finding that "environmental conditions across the species' range, *particularly soil characteristics and associated life history characteristic[] differences between the western and eastern portions of the range*, may be used as an indication of adaptive capacity for the gopher tortoise, allowing the species to withstand changing conditions," AR_003678 (emphasis added). This "[i]nconsistent reasoning" is "the hallmark of arbitrary action." *NRDC v. EPA*, 38 F.4th 34, 51–52 (9th Cir. 2022);

---

[12] As explained above, requiring Units 1 and 2 to be "essential to a specific life history function for the species that is not found in the remainder of the range" is tantamount to requiring the Tortoise to be threatened or endangered throughout all of its range.

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812, 828 (N.D. Cal. 2022) (overturning SPR analysis where FWS failed to explain how a portion "could add to the resiliency, redundancy, and representation of gray wolves" and yet not be significant).

In any event, it is inherently arbitrary for FWS to use the threat from habitat degradation as a factor that both *qualifies* Units 1 and 2 to meet the "status" portion of the analysis and also *disqualifies* them from meeting the "significance" factor, creating a rigged scheme where the Tortoise can never meet the SPR standard. *Compare* AR_003683 (finding "less habitat management" in Units 1 and 2 contributes to them "ha[ving] a different status than the remainder of the range") *with* AR_003684 (finding "lower quality or less extensive habitat" in Units 1 and 2 contribute to a finding that the units are not significant); *see Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 901 (D. Or. 2016) (rejecting agency effort to cite evidence as supportive of one conclusion while disregarding the same evidence when making another).[13]

FWS's arbitrary analysis is only underscored by its inconsistent treatment of one of the same units in its DPS analysis. There, conveniently recharacterizing Unit 1 as the "western population," FWS determined that the *Unit 1 alone* was significant for the purposes of listing a DPS "based, in part, upon evidence that loss of portions would result in a significant gap in the range of the taxon." AR_003686. The loss of Unit 1 cannot simultaneously fail to "constitute a large geographic area relative to the

––––––––––––––––––––

[13] Denying the Tortoise protection in an SPR because threats from habitat degradation have advanced further in that portion than in others is also contrary to the ESA's mandate to protect a species endangered or threatened by "the present or threatened destruction, modification, or curtailment of its habitat or range." 16 U.S.C. § 1533.

remaining portions of the range of the species" when considered with Unit 2, AR_003684, and also create "a significant gap in the range of the taxon." AR_003686.[14]

Where, as here, FWS has "offered an explanation for its decision that runs counter to the evidence before the agency," and otherwise failed to explain the significant logical and factual contradictions in its own analyses, the decision is arbitrary and departs from the best available science, rendering the Denial unlawful. *State Farm*, 463 U.S. at 43; 16 U.S.C. § 1533(b)(1)(A); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 488 F. Supp. 3d at 1231–32 (remanding FWS's listing decision where conclusion in SPR analysis that risk of extinction was "uniform across the range" was contrary to FWS's own finding that major threats would not have uniform impacts).[15]

### III.    FWS failed to rationally explain its choice to limit the foreseeable future analysis to 80 years.

FWS failed to rationally explain why it used a truncated, 80-year timeline to conclude that the Tortoise is not "likely to become endangered within the foreseeable future (a threatened species)," AR_003682, where experts have established a longer timeframe based on the Tortoise's life history and threats. FWS must "describe the foreseeable future on a case-by-case basis, using the best available data and taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability." 50 C.F.R. § 424.11(d). Here, FWS relied on two publications by Tortoise biologists and other experts in the Gopher Tortoise

---

[14] FWS's parsing of its own policies interpreting "significant," AR_003687, has no bearing on this error, as it is patently arbitrary for FWS to reach conflicting factual conclusions depending on whether it is considering SPR or DPS.

[15] Likewise, the SPR analysis for the Eastern DPS is arbitrary and contrary to the best available science because FWS again ignored its own findings regarding the genetic significance of Unit 2. AR_003439 (SSA); AR_003682 (Denial).

Council (GTC) that defined the "smallest population size that will reliably persist through a biologically appropriate time frame," which was "100 years . . . or 200 years under favorable habitat conditions." AR_003415; AR_008022–28 (GTC 2013); AR_008730–36 (GTC 2014). Yet FWS limited its analysis to 80 years, which barely includes the lifespan of a single Tortoise (50–80 years or more). AR_003326; AR_008111. For the long-lived Tortoise, AR_003326, this nearsighted view risks obscuring future population extirpations and overestimating the species' viability. AR_003601 (explaining that even large populations may be nonviable because of unsuccessful reproduction).

Because FWS's conclusion is "inconsistent with that of significant relevant experts," as well as its own findings about Tortoise life history, it must explain the basis for its conclusion and why it distinguished or rejected other conclusions. Solicitor's Memorandum Opinion M-37021, The Meaning of "Foreseeable Future" in Section 3(20) of the Endangered Species Act, 10 (Jan. 16, 2009) (Ex. 5).[16] FWS stated that 80 years is "sufficiently reliable to provide a reasonable degree of confidence in the prediction," AR_003662; but the record reveals that FWS limited its analysis because one scientist "felt uncomfortable making predictions past 80 years into the future because of uncertainty among models and parameters." AR_003543. This reason fails to bridge the chasm between the best available science and the FWS's ultimate decision to limit its analysis. *Defs. of Wildlife v. U.S. Dep't of the Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013) (holding courts should defer to an agency only "as long as its conclusions are rational"); *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1024 (9th Cir. 2011); *State Farm*, 463 U.S. at 43.

---

[16] FWS applied the 2009 Memorandum to its foreseeable future analysis. AR_003662.

IV.   **FWS failed to consider the inadequacy of regulatory mechanisms.**

FWS's Denial also failed to consider the inadequacy of existing regulatory

mechanisms, one of five statutory factors that the agency must consider when making a

listing decision. 16 U.S.C. § 1533(a)(1)(D). Despite ongoing declines, FWS found that

existing regulatory mechanisms "influence gopher tortoise viability through conservation

and restoration," to justify reversing its decision that listing the Tortoise was warranted.

AR_003681. However, FWS never analyzed whether these mechanisms are *adequate*

to address current and future threats. For example, despite incorporating habitat

management efforts into its model,[17] FWS never analyzed whether regulatory

mechanisms relating to habitat management were certain to occur and be effective,

which violates FWS's own Policy on Evaluation of Conservation Efforts When Making

Listing Determinations (PECE). 68 Fed. Reg. 15100, 15101 (Mar. 28, 2003) (requiring

FWS to analyze: "(1) [t]he certainty that the conservation efforts will be implemented

and (2) the certainty that the efforts will be effective"); *see Colo. River Cutthroat Trout v.*

*Salazar*, 898 F. Supp. 2d 191, 208 (D.D.C. 2012); *Or. Nat. Res. Council v. Daley*, 6 F.

Supp. 2d 1139, 1153-56 (D. Or. 1998) (finding an agency cannot rely on "unenforceable

efforts" because "[a]bsent some method of enforcing compliance, protection of a

species can never be assured). This PECE analysis is wholly absent from FWS's

Denial. *See generally* AR_003657–91. Nevertheless, FWS's own findings indicate that

habitat management is *not* effective to address the threat of habitat degradation

because "incompatible practices and insufficient management continue to . . . influence

gopher tortoise viability," AR_003667; AR_003302 (recognizing habitat degradation is

---

[17] The PVA model's inputs for habitat management impact the projected total population size at the year 2100 by approximately 2,000 Tortoises. AR_003461.

among "the most significant factors" influencing Tortoise viability); AR_003389 (finding

forestry best practices are "voluntary").[18] Because FWS failed to analyze one of the five

statutory listing factors, 16 U.S.C. § 1533(a)(1)(D), while violating its own policy, its

decision is unlawful and must be vacated and remanded for a new listing decision.

## REMEDY

If the Court finds in Plaintiffs' favor, they respectfully ask the Court to vacate the

October 12, 2022 Denial and remand to FWS to issue a new, lawful decision within 12

months of the Court's order. Vacatur and remand is the "ordinary APA remedy" if the

Denial is found to be unlawful, arbitrary, or capricious. *Black Warrior Riverkeeper, Inc. v.*

*U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (internal quotation

marks omitted); *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 413–14 (1971)

(holding that "agency action must be set aside" if  it is arbitrary, capricious, or unlawful);

5 U.S.C. § 706(2)(A). Congress intends FWS to make listing decisions within 12

months. *See* 16 U.S.C. § 1533(b)(1)(B).

## CONCLUSION

Plaintiffs respectfully ask the Court to rule in their favor on their motion for

summary judgment and to vacate and remand FWS's Denial so that the agency may

issue a new 12-month finding for the Tortoise within 12 months of the Court's Order.

---

[18] FWS's Denial also relied on "translocation of individuals," a strategy employed through Florida regulatory measures, AR_003384; AR_003690. But FWS found that "it [is] difficult to determine if translocations result in viable gopher tortoise populations," AR_003382, and "there are still uncertainties about its efficacy." AR_003383–84. Alarmingly, FWS found that this measure could "result in overall net loss of habitat if not implemented in conjunction with acquisition and additional protection of habitat when needed," AR_003384; AR_003669. FWS also had—but never addressed, AR_012427–29—information submitted by the Center showing that Florida's translocation program was actively failing to address threats to the Tortoise. AR_012240–49; AR_012423–26.

Respectfully submitted this 17th day of January, 2025.

_/s/ Elise Pautler Bennett_
ELISE PAUTLER BENNETT
Florida Bar No. 106573
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Telephone: (727) 755-6950
Fax: (520) 623-9797
Email: ebennett@biologicaldiversity.org

_/s/ Ragan Edward Whitlock_
RAGAN EDWARD WHITLOCK
Florida Bar No. 1034177
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Telephone: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

*Counsel for Plaintiffs Center for Biological Diversity and Nokuse Education, Inc.*