**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**Jacksonville Division**

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY** and **NOKUSE EDUCATION, INC.,** | |
| *Plaintiffs*, | **Case No. 3:23-cv-936-WWB-LLL** |
| v. | |
| **U.S. FISH AND WILDLIFE SERVICE,** *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 29)**

## TABLE OF CONTENTS

NOTICE AND CROSS-MOTION ................................................................. 1

INTRODUCTION ................................................................................... 1

BACKGROUND ..................................................................................... 2

   I.   The Endangered Species Act ........................................................ 2

   II.  Gopher Tortoise Biology ............................................................. 4

   III.  Gopher Tortoise Listing History and FWS's 2022 "Not Warranted" Finding ......... 5

STANDARD OF REVIEW ......................................................................... 8

ARGUMENT ......................................................................................... 9

   I.   FWS Used Best Available Science When Applying the PVA Model. ................. 9

     A.   Immigration ................................................................... 10

     B.   Maturation Rate .............................................................. 12

     C.   Threat of Urbanization ...................................................... 14

   II.  FWS's SPR Analysis Is Reasonable and Should Be Upheld. ...................... 17

     A.   The ESA Delegates to FWS the Task of Judging "Significant" on a Species-by-species Basis. ....... 17

     B.   FWS Applied a Reasonable Interpretation of "Significant." ....................... 19

     C.   FWS Properly Explained Its Rationale for Analysis Units 1 and 2. .............. 21

   III.  FWS Rationally Explained its "Foreseeable Future" Timeframe. .................. 25

   IV.  FWS Properly Considered Existing Regulatory Mechanisms. ...................... 28

REMEDY ............................................................................................. 30

CONCLUSION ...................................................................................... 30

## TABLE OF AUTHORITIES

**Case**                                                                 **Page(s)**

*Am. Wildlands v. Kempthorne*,
530 F.3d 991 (D.C. Cir. 2008) .................................................................. 13

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) ...................................................................................... 8

*Bldg. Indus. Ass'n of Superior Cal. v. Norton*,
247 F.3d 1241 (D.C. Cir. 2001) ................................................................ 15

*Camp v. Pitts*,
411 U.S. 138 (1973) .................................................................................... 8

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .................................................................................... 8

*Coastal Wellness Ctrs. v. Progressive Am. Ins. Co.*,
309 F. Supp. 3d 1216 (S.D. Fla. 2018) .................................................... 26

*Colo. River Cutthroat Trout v. Salazar*,
898 F. Supp. 2d 191 (D.D.C. 2012) .......................................................... 30

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
488 F. Supp. 3d 1219 (S.D. Fla. 2020) ................................................. 9, 28

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
690 F. Supp. 3d 322 (S.D.N.Y. 2023) ...................................................... 21

*Defenders of Wildlife v. Jewell*,
176 F. Supp. 3d 975 (D. Mont. 2016) .......................................... 20, 23, 25

*Defenders. of Wildlife v. Norton*,
258 F.3d 1136 (9th Cir. 2001) .................................................................. 17

*Defenders of Wildlife v. U.S. Fish and Wildlife Service* ,
584 F. Supp. 3d 812 (N.D. Cal. 2022) ...................................................... 25

*Desert Survivors v. U.S. Dep't of the Interior*,
321 F. Supp. 3d 1011 (N.D. Cal. 2018) .................................................... 18

*Desert Survivors v. U.S. Dep't of the Interior*,
No. 20-cv-06787-JSC, 2022 WL 1539530 (N.D. Cal. May 16, 2022) ........................ 23

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) .................................................................. 30

*Fund for Animals v. Rice*,
   85 F.3d 535 (11th Cir 1996) ........................................................ 8

*Judulang v. Holder*,
   565 U.S. 42 (2011) .................................................................... 9

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) .................................................................. 18

*Loggerhead Turtle v. Cty. Council*,
   120 F. Supp. 2d 1005 (M.D. Fla. 2000) ........................................ 8

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ................................................... 17, 18, 19

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) .............................................................. 9, 14

*Miccosukee Tribe of Indians of Fla. v. United States*,
   566 F.3d 1257 (11th Cir. 2009) .............................................. 9, 15

*Miccosukee Tribe of Indians v. United States*,
   420 F. Supp. 2d 1324 (S.D. Fla. 2006) ...................................... 12

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................... 8

*NRDC v. Coit*,
   597 F. Supp. 3d 73 (D.D.C. 2022) ............................................. 30

*Or. Nat. Res. Council v. Daley*,
   6 F. Supp. 2d 1139 (D. Or. 1998) .............................................. 30

*Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*,
   113 F.4th 943 (D.C. Cir. 2024) .................................................. 17

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ..................................................... 28

*Sierra Club v. Flowers*,
   526 F.3d 1353 (11th Cir. 2008) .................................................. 8

**Statutes**

5 U.S.C. § 706(2)(A) .............................................................................................................. 8

16 U.S.C. § 1532(6) ........................................................................................................... 2, 18

16 U.S.C. § 1532(16) ......................................................................................................... 2, 22

16 U.S.C. § 1532(20) ......................................................................................................... 3, 25

16 U.S.C. § 1533(a)(1) ................................................................................................ 2, 3, 18, 28

16 U.S.C.§ 1533(b)(1)(A) ....................................................................................................... 3, 9

16 U.S.C. § 1533(b)(3)(A) ......................................................................................................... 3

16 U.S.C. § 1533(b)(3)(A)-(B). ................................................................................................... 3

16 U.S.C. § 1533(b)(3)(B)(i) ...................................................................................................... 3

16 U.S.C. § 1533(b)(3)(B)(ii) ..................................................................................................... 3

16 U.S.C. § 1533(b)(3)(C)(i) ...................................................................................................... 3

16 U.S.C. § 1533(b)(5)(A)(Ii). .................................................................................................... 3

16 U.S.C. § 1533(b)(6)(A)(i). ..................................................................................................... 4

16 U.S.C. § 1533(c)(2) ............................................................................................................. 5

16 U.S.C. § 1540(g)(1)(A) ......................................................................................................... 8

**Rules**

Federal Rule of Civil Procedure 56 ............................................................................................. 1

**Code of Federal** Regulations

50 C.F.R. § 402.01(b) .............................................................................................................. 2

**Federal Register**

52 Fed. Reg. 25376 (July 7, 1987) ............................................................................................. 1

61 Fed. Reg. 4722 (Feb. 7, 1996) ............................................................................................ 22

68 Fed. Reg. 15100 (Mar. 28, 2003) ......................................................................................... 29

74 Fed. Reg. 46401 (Sept. 9, 2009) ............................................................... 5

76 Fed. Reg. 66370 (Oct. 26, 2011) ............................................................... 5

79 Fed. Reg. 37578  (July 1, 2014) ............................................................... 22

87 Fed. Reg. 61834 (Oct. 12, 2022) ............................................................... 1

## <u>TABLE OF REFERENCES AND ACRONYMS</u>

FWS_###    Page citation to U.S. Fish and Wildlife Service's amended administrative record lodged on June 14, 2024 (ECF No. 19)

APA        Administrative Procedure Act

DPS        Distinct Population Segment

ESA        Endangered Species Act

FWS        U.S. Fish and Wildlife Service

PECE       Policy on Evaluation of Conservation Efforts

PVA        Population Viability Analysis

SLEUTH     Slope, Land use, Exclusion, Urban, Transportation, and Hill-shade model

SPR        Significant Portion of Its Range

SSA        Species Status Assessment

## NOTICE AND CROSS-MOTION

Please take notice that the United States Fish and Wildlife Service ("FWS"); Paul Souza, exercising the delegated authority of Director of FWS; and Doug Burgum, in his official capacity as Secretary of the Interior (collectively, "Defendants"), hereby cross-move for summary judgment in the above-captioned case, pursuant to Federal Rule of Civil Procedure 56 and the Court's Amended Case Management Schedule (ECF No. 26). Defendants' brief is based on the memorandum below and the amended administrative record lodged on June 14, 2024 (ECF No. 19) and complies with the 30-page limit (ECF No. 28). Plaintiffs requested oral argument on this matter (ECF No. 30). Defendants do not think argument is necessary but do not oppose Plaintiffs' request.

## INTRODUCTION

The record before the Court supports FWS's determination that listing the gopher tortoise rangewide or the eastern distinct population segment ("DPS") as threatened or endangered under the Endangered Species Act ("ESA") is not warranted.[1] *See* FWS_3657 (87 Fed. Reg. 61834 (Oct. 12, 2022)). Based on the best scientific and commercial data available, FWS found that gopher tortoise populations are widely distributed throughout the species' six-state range, and sufficient quality and quantity of habitat remains to ensure the viability of the species. Ongoing Federal, State, and private conservation actions, like land acquisition for conservation and habitat restoration activities, are expected to benefit the species into the future. While recognizing the potential impacts of urbanization, climate change, sea level rise, and habitat

---

[1] The Western DPS of the gopher tortoise is listed as a threatened species under the ESA. *See* 52 Fed. Reg. 25376, 25380 (July 7, 1987).

management, FWS projected that at least 47,000 adult females would remain on the landscape within the foreseeable future in 188 to 198 local populations. This is a conservative underestimate, not counting adult males or any gopher tortoises on private lands. Thus, neither the species nor the Eastern DPS of the species is in danger of extinction or likely to become so within the foreseeable future.

As an expert agency charged by Congress with implementing the ESA, FWS's exercise of judgment on a scientific subject within its special area of expertise is entitled to substantial deference. Here, Plaintiffs fail to carry their high burden of showing that FWS's determination is so implausible that it could not be ascribed to a difference in view. Instead, Plaintiffs attack FWS's use of best available modeling techniques, criticize FWS for not considering private lands data that FWS never had, confuse the "significant portion of its range" analysis, and ask this Court to substitute its judgment for FWS's. For the reasons below, the Court should enter judgment in favor of Defendants.

## BACKGROUND

### I.    The Endangered Species Act

Section 4 of the ESA directs the Secretary[2] to determine which species[3] should be listed as threatened or endangered. 16 U.S.C. § 1533(a)(1). An endangered species "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is one "likely to become an endangered species within the

---

[2] The Secretary of the Department of the Interior has jurisdiction over the gopher tortoise and delegated his ESA responsibilities to FWS. *See* 50 C.F.R. § 402.01(b).

[3] The term "species" includes any subspecies of fish or wildlife or plants, and any DPS of any species of vertebrate fish or wildlife which interbreeds when mature. 16 U.S.C. § 1532(16).

foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). A species may warrant listing because of any of the following five factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1). The determination whether to list a species must be made "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

A species may be listed as endangered or threatened under the ESA either on the initiative of FWS or because of a petition submitted by an "interested person." *Id.* § 1533(b)(3)(A). If upon review, FWS finds that the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted," FWS must initiate a species status review and make a finding within 12 months stating whether the petitioned action is warranted, not warranted, or warranted but precluded by other pending proposals ("12-month finding"). *Id.* § 1533(b)(3)(A)-(B).

If the 12-month finding is "not warranted," the Secretary publishes that finding and no further action is required. *Id.* § 1533(b)(3)(B)(i). If listing is warranted but precluded by higher priority listing actions, FWS adds the species to a candidate species list and must annually review the petition until it determines listing is warranted or not warranted. *Id.* § 1533(b)(3)(C)(i). If listing is warranted, FWS must promptly publish "a general notice and the complete text" of a proposed rule to list the species. *Id.* § 1533(b)(3)(B)(ii), (b)(5)(A)(i). Within one year of publication of the proposed rule, FWS must publish a final rule that either (a) places the species on the endangered or threatened list, (b) extends the timeline for making the determination due to a substantial disagreement regarding the

sufficiency or accuracy of the available data, or (c) provides notice that the proposed rule is being withdrawn. *Id.* § 1533(b)(6)(A)(i).

## II.    Gopher Tortoise Biology

The gopher tortoise (*Gopherus polyphemus*) is a land-dwelling turtle characterized by a dark brown to grayish-black upper shell and a yellowish lower shell. FWS_3658. Adults are typically 10 to 12 inches long and weigh 9 to 13 pounds. *Id.* Adapted to digging and living primarily underground, their hind feet are round and pad-like, and their forelimbs are shovel-like. *Id.* Gopher tortoises live about 50 to 80 years, FWS_3326, and reach reproductive maturity between 9 and 20 years depending on size. FWS_3658. They eat grasses, plants, flowers, fruits, and leaves, as well as insects and carrion. *Id.* Gopher tortoises spend most of their time in burrows, only emerging during the day to bask in the sun, feed, and reproduce. FWS_3659. They can excavate many burrows over their lifetime and often use several each year. *Id.*

Gopher tortoise habitat requires well-drained, sandy soils (for burrows and nests) with an open canopy, sparsely vegetated midstory, and abundant herbaceous groundcover (for food). *Id.* Historically, gopher tortoise habitat included open pine forests maintained by frequent, lightning-generated fires. *Id.* Currently, gopher tortoise habitat includes longleaf pine systems, sandhill, dry oak uplands, and coastal maritime scrub areas. *Id.* A variety of land management practices like prescribed fire, grazing, mowing, and timber harvesting, are used to restore, enhance, and maintain habitat today. *Id.* The species' range extends from Louisiana in the west to southern South Carolina in the east, and Florida to the south. FWS_3658. Rangewide, approximately 80% of potential gopher tortoise habitat occurs in private ownership, with the remainder owned or managed by local, State, Federal, or private conservation entities. *Id.*

4

III.    **Gopher Tortoise Listing History and FWS's 2022 "Not Warranted" Finding**

In 1987, FWS listed the Western DPS of gopher tortoise as a threatened species. 52 Fed. Reg. at 25380. In 2006, FWS received a petition to list the eastern population of gopher tortoise. FWS_3657. FWS found the petition contained substantial information indicating that listing may be warranted. 74 Fed. Reg. 46401 (Sept. 9, 2009). FWS published its 12-month finding that listing was warranted but precluded by higher-priority listing actions. 76 Fed. Reg. 66370 (Oct. 26, 2011). The eastern population was placed on FWS's list of candidate species and evaluated annually. FWS_3657. Pursuant to a court-ordered settlement in 2022, FWS re-evaluated the eastern population's status to make a warranted or not warranted listing determination. *Id.*

FWS performed a biological review of the best scientific and commercial data available, including an assessment of potential threats to the species, and published it in a Species Status Assessment ("SSA") report.[4] *See* FWS_3300. The SSA team was composed of FWS biologists, in consultation with other species experts. FWS_3657. Peer and partner reviewers provided comments on the draft SSA. FWS_3588-630. To inform the SSA, FWS received two general types of data from State and Federal agencies, local governments, and some private landowners: (1) spatially explicit data about gopher tortoise burrow locations, and (2) private lands data without location information. FWS_3672. All data provided were integral to evaluating the current condition of the gopher tortoise, although FWS acknowledged that different data types come with different assumptions and limitations. *Id.*

---

[4] FWS simultaneously completed a 5-year review for the Western DPS, *see* 16 U.S.C. § 1533(c)(2), so the SSA addressed the entire species range, not just the Eastern DPS.

The SSA describes gopher tortoise current condition in terms of resiliency, redundancy, and representation by analysis units (units of representation for the gopher tortoise). FWS_3663. Resiliency describes the ability of the species to withstand stochastic events and normal year-to-year variations in environmental and demographic conditions (e.g., warm or cold years). *Id.* Redundancy describes the ability of the species to withstand catastrophic events that would result in the loss of a substantial component of the species' total overall population (e.g., drought). *Id.* Representation describes the ability of a species to withstand and adapt to long-term changes in environmental conditions (e.g., climate change) and is measured by the breadth of genetic or environmental diversity within and among populations. *Id.* The SSA references five analysis units, delineated based on genetic differences, physiographic regions, and input of species experts: Unit 1 (Western), Unit 2 (Central), Unit 3 (West Georgia), Unit 4 (East Georgia), and Unit 5 (Florida). FWS_3673-75.

For resiliency, FWS reviewed local populations in each analysis unit considering the threats impacting the species. FWS_3675-77. Rangewide, FWS found 360 local populations of low current resiliency, 169 local populations of moderate current resiliency, and 127 local populations of high resiliency. FWS_3676 (Table 2). For redundancy and representation, FWS noted that populations are widely distributed within and among analysis units across the species' range, and all analysis units contain populations of high and moderate resiliency. FWS_3677-78. Thus, FWS found it highly unlikely any single event would put the species as a whole at risk. FWS_3678.

The SSA also analyzed future condition and viability of the species. *Id.*; *see also* FWS_3442-73. To do this, FWS used a population viability analysis ("PVA") model that

6

linked intrinsic factors (i.e., demographic parameters) to four extrinsic factors expected to impact gopher tortoise population viability: climate warming, sea level rise, urbanization, and shifts in habitat management. FWS_3678. FWS projected six plausible future scenarios of varying threat magnitude at 40, 60, and 80 years in the future to predict the species' population growth and extinction risk. *Id.* By 2100, FWS projected that the current total population size will decline by 28% to 33%, and the number of local populations will decline by 68% to 70%. FWS_3458-59. However, despite projected declines in the number of populations, FWS concluded that overall projections suggest extinction risk for the species is relatively low in the future. FWS_3681. Specifically, FWS found that the presence of relatively large numbers of individuals and populations out to 2100 suggests resiliency of the species in the face of change, and redundancy to buffer from future catastrophic events. *Id.* FWS also found that the spatial distribution of populations predicted to occur on the landscape in the future are distributed evenly among genetic analysis units, suggesting future adaptive capacity. *Id.*

Relying on the SSA, in 2022, FWS issued a finding that listing the gopher tortoise rangewide or the Eastern DPS is not warranted.[5] FWS_3657. The decision considers the impacts to the species from habitat loss, degradation, and fragmentation; climate change; habitat management; disease, predation, harvest and roundups, and nonnative invasive species; and conservation efforts and regulatory mechanisms. FWS_3663-72. FWS analyzed future conditions at 40, 60, and 80 years because projections in those timeframes were sufficiently reliable to provide a reasonable degree of confidence; FWS

---

[5] FWS's 2022 determination also confirms that the western and eastern populations of gopher tortoise each meet the definition of a DPS, FWS_3684-87, and that the Western DPS still meets the definition of a threatened species. FWS_3657, 3687-89.

considered this the "foreseeable future" for the gopher tortoise. FWS_3682. Plaintiffs filed a complaint challenging the not warranted determination in August 2023. ECF No. 1.

## STANDARD OF REVIEW

Plaintiffs brought this case pursuant to the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A). The ESA provides for a right of action but not an independent standard or scope of review. Thus, judicial review of FWS's finding is governed by the Administrative Procedure Act ("APA"). *See, e.g.*, *Fund for Animals v. Rice,* 85 F.3d 535, 541-42 (11th Cir 1996); *Loggerhead Turtle v. Cty. Council*, 120 F. Supp. 2d 1005, 1013 (M.D. Fla. 2000). A court may set aside final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is a narrow one; an agency decision is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A court determines agency compliance with the law solely on the administrative record. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). "The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Sierra Club v. Flowers*, 526 F.3d 1353, 1360 (11th Cir. 2008) (internal quotations omitted). This review is highly deferential, especially where, as here, the agency is "making predictions, within its area of special expertise, at the frontiers of science." *Balt. Gas & Elec. Co. v. NRDC*,

462 U.S. 87, 93, 96, 103, 105-06 (1983); *see also Judulang v. Holder*, 565 U.S. 42, 53 (2011); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375-77 (1989).

<u>ARGUMENT</u>

**I.    FWS Used Best Available Science When Applying the PVA Model.**

The ESA requires that FWS base listing determinations on the "best scientific and commercial data available" at the time the decision is made. 16 U.S.C. § 1533(b)(1)(A). "The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257,1265 (11th Cir. 2009). An agency complies with the best available science standard so long as it does not "disregard[] available scientific evidence that is in some way better than the evidence [the agency] relies on." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 488 F. Supp. 3d 1219, 1227 (S.D. Fla. 2020).

FWS complied with the best available science standard in relying on a PVA model developed by Dr. Brian Folt, a wildlife population biologist, to predict future population growth and extinction risk for the gopher tortoise. FWS_3678; *see also* FWS_3523. SSA Appendix B is Dr. Folt's detailed description of the PVA model. *Id.* FWS received expert input and review on the PVA model. FWS_3588-630. FWS recognized that, although the model had limitations and future opportunities for improvement, it was the best scientific information available at the time to make predictions about the species. FWS_3552-53.[6]

---

[6] After the SSA was finalized, Dr. Folt and some FWS biologists published an article about the model in a peer-reviewed research journal, further adapting the model in the review process for that article. *See* FWS_11116 (Folt et al. 2022).

Plaintiffs erroneously allege that FWS failed to comply with the ESA's best available science standard because the PVA model disregarded FWS's own findings about immigration, rates of maturation, and urbanization threats to the species. As explained below, that is not the case. Rather, Plaintiffs' arguments amount to a difference of opinion of what constitutes the best available science and how it should be considered.

### A. Immigration

One of the demographic parameters incorporated into the PVA model is immigration, the permanent move of gopher tortoises from one population to another. FWS_3446. Little quantitative information is available describing the frequency or success of immigration, although one study found 2% of adult gopher tortoises emigrated from local populations each year. *Id.* (citing FWS_6202). Scientists in the field have recognized the occurrence of immigration, as well as the lack of analysis on the topic. *See, e.g.*, FWS_10419 (Goessling 2020, "Improved models that incorporate immigration and emigration and better reflect the dynamics of peripheral populations would assist in determining how such populations best contribute to species recovery and regional conservation targets."). Indeed, previous demographic models for gopher tortoises largely ignored immigration. FWS_11133. Those models often predicted population declines, even though recent evidence at some studied populations was more consistent with population stability. *Id.* To see if the discrepancy was due to ignoring immigration, Dr. Folt included an immigration parameter in the PVA model. *Id.* FWS considered this the best available way to model the species.

FWS modeled six scenarios of future species conditions, with stressors and management varying in magnitude. FWS_3455. As part of each scenario, the model drew

a random, small rate (less than one) to generate immigration into the populations. *See* FWS_3444, 3446, 3529 (describing in detail). Given uncertainty associated with the immigration parameter, the PVA model also included a sensitivity analysis. FWS_3543. To that end, FWS crafted three more scenarios: a "no immigration," "high immigration," and "very high immigration" scenario simulated with stressor and habitat management values from the "medium stressors" scenario with a projection interval of 80 years. FWS_3456. FWS found that model projections were sensitive to input values for immigration rate. FWS_3467. The "no immigration" and "high immigration" scenarios produced results that strongly deviated from results of the six stressor and management scenarios. FWS_3551. This suggested immigration is an important parameter in tortoise demography and should be an area of future study in the field and in modeling. *Id.*

Disregarding the SSA discussion addressing the PVA model's sensitivity to the immigration parameter, Plaintiffs go to great lengths to describe the sensitivity. ECF No. 29 ("Pls.' Br.") at 12-16. Without pointing to any better methods existing at the time, Plaintiffs claim FWS's immigration parameter was faulty. Yet ignoring immigration entirely would have been contrary to the ESA's mandate. Prior models did not incorporate immigration so this was a new contribution to the field. *See* FWS_3472, 3529. FWS appropriately based the model on the best available scientific data while noting immigration as a parameter for improvement and study in future research. FWS_3472-73. Indeed, the point of the sensitivity analysis was to understand how this new parameter affects the other modeled scenarios. *See* FWS_3456 (describing sensitivity analysis). Plaintiffs' focus on the extreme scenarios modeled in the sensitivity analysis to accuse FWS of modeling "a biological impossibility" is misleading. Pls.' Br. at 14. Those results

were purely meant to test a model parameter, and FWS did not rely on the sensitivity analysis results to make the final listing determination.

Plaintiffs also compare the SSA model and the Folt et al. 2022 article model to purportedly show "glaring" differences. *Id.* at 14-15. To start, the two models are not "otherwise identical" except for an input difference of 100 gopher tortoises, *id.* at 15, so Plaintiffs' comparison is not apples-to-apples. *Cf.* FWS_11121 (drawing specific numbers of individuals from available immigration pool, instead of using random, small rate to generate immigration like the SSA model). Despite some differences, the takeaway from both models is the same—immigration is an influential parameter that should be included in gopher tortoise population modeling and deserves attention in future research to increase predictive accuracy. FWS_3472-73; FWS_11133.

To assess the impact of immigration on gopher tortoise populations, FWS permissibly applied the best available information, recognizing its limitations. This is a decision to which the court should apply the APA's deferential standard. *See Miccosukee Tribe of Indians v. United States*, 420 F. Supp. 2d 1324, 1336 (S.D. Fla. 2006).

### B. Maturation Rate

FWS also incorporated maturity age as a PVA model parameter. FWS_3445. Gopher tortoise maturity is determined by size rather than age, and growth rates can vary among populations and habitat quality. FWS_3332. Therefore, predicting maturity rate in a model is difficult. For the PVA model, FWS used a stage-based population model known as the Lefkovitch model that was developed in 1965 and recently applied to gopher tortoise populations in a 2021 article. *See* FWS_3524; FWS_11050 (Folt et al. 2021). Local population demography was conceptualized into two life stages: juveniles and

adults. FWS_3442-43. During a given time-step, juveniles had a probability of maturing to become adults. *Id.* To calculate this, a linear regression equation estimated the relationship between mean annual temperature and maturity age for females (based on a literature review), then regression coefficients simulated mean maturity ages for populations (given geographic location and mean annual temperature). FWS_3444-45.

Like any scientific method, this technique has its limitations. For example, the formula assumes that all individuals in the juvenile age class for a population have an equal probability of transitioning to the adult state. FWS_3528. Plaintiffs call this the flat age-within-stage approach. Pls.' Br. at 16-17. However, at the time that FWS was working on its gopher tortoise SSA, the Lefkovitch stage-based population model had been around for over five decades and was the established way to project populations where empirical information on stage-based transition rates was not available. *See* FWS_3524 (referencing Lefkovitch model); FWS_3557 (citing Lefkovitch 1965).

Plaintiffs argue that FWS should have used a different technique for modeling maturity rate, as described in the Kendall et al. 2019 paper. Pls.' Br. at 17 (citing FWS_11784). Plaintiffs are correct that the paper disagrees with the flat age-within-stage approach and advocates for another method. FWS_11784-94. But Plaintiffs are incorrect that FWS disregarded the paper. FWS considered all materials in its amended administrative record, including Kendall et al. 2019. At the time, Kendall et al. 2019 was a new study, whereas the Lefkovitch model had been established in the scientific community for decades. FWS chose the method with existing scientific support.

FWS reasonably chose one modeling technique over another when experts had not settled on Plaintiffs' preferred method as best. *Cf. Am. Wildlands v. Kempthorne*, 530

F.3d 991, 998-99 (D.C. Cir. 2008) (holding that agency's use of available data and test methods was reasonable even though arguably better methods existed because those had not yet been used on species in question); *Marsh*, 490 U.S. at 377-78 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

### C. Threat of Urbanization

As a key driver of gopher tortoise future condition, urbanization was modeled in FWS's future conditions analysis. FWS_3678. Specifically, FWS linked urbanization projections from the Slope, Land use, Exclusion, Urban, Transportation, and Hill-shade model ("SLEUTH" model) to habitat management of local populations with prescribed fire and with baseline immigration rates of gopher tortoises across landscape populations. FWS_3679 (citing FWS_8990-97). Local population data used for this modeling came from assessments of local populations on lands managed for conservation, not private lands. FWS_3529-30. FWS found that increased urbanization will decrease immigration and habitat management among populations, an effect that future conservation planning strategies could ameliorate. FWS_3471.

Plaintiffs' arguments against FWS's analysis of urbanization boil down to the fact that FWS did not incorporate data from all private lands in the gopher tortoise range. *See* Pls.' Br. at 17-20. Plaintiffs misleadingly frame the issue as if FWS intentionally ignored data that it possessed. *Id.* at 20 (claiming FWS "entirely failed to consider" the "vulnerable populations on private lands"). To the contrary, FWS acknowledged repeatedly that it did not have geospatial or abundance data available from all private lands. *See, e.g.*,

14

FWS_3672-73; FWS_3529-30. This was not for lack of trying; FWS solicited information by distributing a private landowner questionnaire. *See* FWS_3511-22. Although FWS received some responses, the "vast majority" did not include "a spatial component because of issues associated with confidentiality of location data." FWS_3672. "Because data received from these questionnaires are not spatially explicit, there [were] limitations to the applicability of the data as it relates to . . . assessment of site-specific factors like habitat quality and quantity." *Id.* In other words, FWS did not exclude data that it possessed, as Plaintiffs suggest.[7] Rather, despite trying to obtain more private lands data, that data was not forthcoming, so FWS chose to move forward with the best data that was available (i.e., data for conservation lands, military installations, and some private lands). FWS_3529-30. This is what the ESA requires. *See Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) ("[T]he Service must utilize the 'best scientific . . . data *available*,' not the best scientific data *possible*.").[8]

In a footnote blaming FWS for "ignor[ing] habitat threats," Plaintiffs misrepresent the "minimum population viability guidelines." Pls.' Br. at 18 n.8. First, the Gopher Tortoise

---

[7] Plaintiffs' factual comparison to *Miccosukee Tribe of Indians v. United States* is off base. Pls.' Br. at 20. That case challenged an incidental take statement under ESA Section 7. 566 F.3d at 1271 (11th Cir. 2009). FWS used habitat markers to estimate population data, rather than a specific bird count, despite having yearly bird count data available. *Id.* at 1275. Relying on legislative history for ESA Section 7, the court held that incidental take impact must be stated in numbers of animals, not habitat markers, "unless it is impractical." *Id.* By contrast, this case arises under ESA Section 4, and the specific population data that Plaintiffs claim should be used was not available to FWS.

[8] For the same reasons explained above, FWS's determination for the Eastern DPS should be upheld. *Cf.* Pls.' Br. at 20 n.10. Moreover, FWS explained its conclusion that conservation measures implemented across the Eastern DPS range, like habitat restoration actions, have improved the condition of the species and are anticipated to continue to do so. FWS_3689-90. This is consistent with FWS's projection that Eastern DPS populations may decrease in the future, while still maintaining enough populations to maintain resiliency, redundancy, and representation. FWS_3689.

Council report explicitly rejected applying the minimum viability population parameters as Plaintiffs do: "[T]he purpose of establishing [minimum viability population] parameters is to provide acceptable benchmarks for conservation and recovery efforts and [] not to determine absolute minimum thresholds that if not met will result in certain population demise." FWS_8022. Second, Plaintiffs refer to "viability" defined by the Gopher Tortoise Council (2013) as if it is binding. *Id.* But that definition "is more of a 'rule of thumb' for conservation planning purposes, and [] does not exactly align with the definition of viability used in [FWS's] SSA." FWS_3339. Finally, Plaintiffs only cite to the Gopher Tortoise Council guideline that a viable tortoise population consists of at least 250 adult tortoises on a property with at least 100 hectares of high quality, well-managed habitat. Pls.' Br. at 18 n.8. Yet, the Council report also describes primary and secondary support populations as consisting of less gopher tortoises on smaller areas of land. FWS_3339. Plaintiffs ignore that "support populations may persist for a long period of time under high-quality habitat conditions," even if they are likely more vulnerable to stochastic events. *Id.*

Regardless, FWS *did* incorporate habitat size and quality in its future conditions analysis.[9] Habitat size was baked into the viability analysis. *See* FWS_3531-32 (describing how the model was initialized with landscape populations that were delimited by identifying local populations connected by suitable habitat with a buffer around each). And habitat quality was considered as part of modeling habitat management. *See* FWS_3449-50 (explaining that management, like prescribed fire, impacts the quality of habitat conditions and describing how habitat management was modeled).

---

[9] Plaintiffs question the data FWS used to justify its resiliency findings. Pls.' Br. at 19 n.9. FWS explained it assessed resiliency using estimated abundance as a proxy for habitat because it lacked consistent, reliable estimates for all populations. FWS_3675.

II.    **FWS's SPR Analysis Is Reasonable and Should Be Upheld.**

After concluding that the gopher tortoise is not threatened or endangered throughout its entire range, FWS considered whether the species should nevertheless be listed because it is in danger of extinction or likely to become so within the foreseeable future throughout a significant portion of its range ("SPR"). FWS_3682-84. FWS evaluated whether there is any portion of the species' range for which it is true that both (1) the portion is significant, and (2) the species is in danger of extinction or likely to become so within the foreseeable future in that portion. FWS_3682. These can be answered in either order; the analysis concludes if either response is negative. *Id.*

For the gopher tortoise, FWS started with the second question and concluded the species has a different biological status in Units 1 and 2 than it does in the remainder of the range (i.e., the gopher tortoise may be endangered or threatened in that portion). FWS_3683. Next, FWS assessed whether that portion is a "significant" portion of the range. FWS_3683-84. Plaintiffs level both a facial and an as-applied challenge against FWS's significance analysis, but neither has merit. Pls.' Br. at 20-27.

### A. The ESA Delegates to FWS the Task of Judging "Significant" on a Species-by-species Basis.

The phrase "significant portion of its range" is not defined in the ESA, and courts have concluded that the phrase is ambiguous. *See, e.g.*, *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001). While the judiciary's role under *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), is to independently determine the best interpretation of a statute when called on, it does not follow that courts must always themselves definitively resolve the meaning of a statutory term or phrase. *Cf. Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 113 F.4th 943, 951 (D.C. Cir. 2024). Here, there is no need

17

to decide what interpretation of "significant" may be best because FWS applied a standard that gave effect to the clear intent of Congress, ensuring that the "throughout a significant portion" phrase was not duplicative of the "throughout all" analysis under the statute.[10]

Moreover, the best reading of the statute is that it delegates to FWS the scientific task of assessing whether a portion of a particular species' range is "significant," within the broad meaning of the term. Congress directed that "*[t]he Secretary shall* by regulation . . . *determine* whether any species is an endangered species or a threatened species because of any of the [five] factors," 16 U.S.C. § 1533(a)(1) (emphasis added), and Congress broadly defined "endangered" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). Read together, the mandate that FWS make the determination and the absence of a statutory definition of the term "significant" suggest that Congress intended to delegate to FWS the task of judging significance for each species. *Loper Bright*, 144 S. Ct. at 2263 (citation omitted).

The role of the Court is limited to "recognizing" the delegation, "fixing the boundaries of the delegated authority," and "ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* at 2247 (cleaned up). Here, the word "significant" itself "leaves [FWS] with flexibility." *Id.* at 2263 (citation omitted); *see Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J., concurring in the judgment) ("'[O]pen-ended terms' like 'reasonable,' 'appropriate,' 'feasible' or 'practicable'" "afford agencies broad policy discretion"). This open-ended term thus hinges on its context:

---

[10] FWS's prior definition of "significant," set forth in a 2014 SPR policy, was invalidated. *Desert Survivors v. U.S. Dep't of the Interior*, 321 F. Supp. 3d 1011, 1070-74 (N.D. Cal. 2018). There, the court rejected an interpretation of "significant" that "result[ed] in a threshold under the [SPR] definition that [was] functionally equivalent to the threshold under the 'throughout all' definition." *Id.*

Congress's direction that FWS make an expert biological determination about whether a particular species is in danger of extinction or likely to become so within the foreseeable future throughout all or a significant portion of its range. *Loper Bright*, 144 S. Ct. at 2263 (words like "appropriate" and "reasonable" leave agencies with flexibility). As explained below, FWS's application of "significant" was sound and should be upheld. If the Court disagrees, it should remand for FWS to revise the application of the term in the first instance because its application to the species may "rest[] on factual premises within the agency's expertise." *Id.* at 2267 (cleaned up).

**B. FWS Applied a Reasonable Interpretation of "Significant."**

Here, FWS interpreted "significant" to refer to the biological importance of a portion to the overall viability of the species. FWS_3683. FWS assessed this by considering whether the portion may:

> (1) occur in a unique habitat or ecoregion for the species, (2) contain high-quality or high-value habitat relative to the remaining portions of the range, for the species' continued viability in light of the existing threats, (3) contain habitat that is essential to a specific life-history function for the species and that is not found in the other portions, or (4) contain a large geographic portion of the suitable habitat relative to the remaining portions of the range for the species.

FWS_3683-84.

Plaintiffs' attempt to undermine this analysis misses the mark. Plaintiffs claim "viability" must refer to whether a species can either "exist" or "become extinct," but FWS did not employ such a dichotomy. Pls.' Br. at 22. In its SSA, FWS defined "viability" as "the ability of a species to sustain populations in the wild over time," explaining it is "not a specific state, but rather a continuous measure" that can be assessed in terms of resiliency, redundancy, and representation. FWS_3319-20.

19

Plaintiffs also ignore that FWS applied four considerations for evaluating whether the portion is significant. FWS_3683-84; *cf.* Pls.' Br. at 23 (referencing only one consideration). Any of the four considerations could have been a basis for finding a portion to be significant. However, none of the four considerations required (as Plaintiffs indicate) that threats to the species in that portion must render the species as a whole threatened or endangered. *See Jewell,* 248 F. Supp. 3d at 958. Plaintiffs only focus on the third consideration and use the generalized example of "feeding and breeding" as specific life-history functions. Pls.' Br. at 23. Taking their own conclusion as fact and working backwards, Plaintiffs argue that, if the gopher tortoise were endangered in the only portion of its range that contained breeding habitat, it would also be endangered throughout all of its range because it would be unable to breed if the species in that portion were to become extinct. *Id.* However, this consideration focuses on differences in habitat for a life-history function, not whether an entire life-history function is contained within a portion. On its face, the third consideration could apply to a situation where one portion contains a certain *type* of food or nesting site, while other portions of the range contain different types of food or nesting sites that may be less essential but still contribute to the species' viability. *See* FWS_3327-28 (describing different types of food and burrow site selection). Accordingly, here, FWS did not use an "unlawful interpretation" of when a portion is significant, such that it makes the SPR and "throughout all" phrases functionally equivalent. *Cf.* Pls.' Br. at 23 (claiming otherwise with no support).

FWS's interpretation of "significance" for the gopher tortoise SPR analysis is reasonable and should be upheld.[11] *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 690 F. Supp. 3d 322, 345 (S.D.N.Y. 2023) (upholding SPR analysis that examined quantitative significance of analysis units and their extent).

### C. FWS Properly Explained Its Rationale for Analysis Units 1 and 2.

Applying its interpretation of significance to the portion (i.e., Units 1 and 2),[12] FWS looked at whether that portion fits into any of the four considerations and concluded that it does not. The portion contains approximately 20% of the suitable habitat currently occupied by the species, which contributes to rangewide representation and redundancy, but does not constitute a large geographic area relative to the rest of this species' range. FWS_3684. Additionally, FWS found that the portion generally contains lower quality or less extensive habitat for gopher tortoises than in the remainder of the range. *Id.*; *see also* FWS_3440-41 (explaining soils in Units 1 and 2 are generally not as naturally suitable as soils in eastern units). Finally, FWS determined that the portion does not contain an area of habitat essential to a specific life-history function for the species that is not found in the remainder of the range. FWS_3684. Therefore, the portion is not a "significant" portion of the gopher tortoise's range. *Id.*

There are numerous problems with Plaintiffs' critique of this analysis. First, Plaintiffs cherry-pick language to make it seem like FWS's analysis units are only based on genetic differences. Pls.' Br. at 24-25. This is incorrect. While genetic differences were

---

[11] FWS used the same interpretation of significance for its SPR analysis of the Eastern DPS and thus, for the reasons explained above, that analysis should also be upheld.

[12] FWS determined that the other analysis units did not have a different status under question two of the SPR framework, and accordingly only combined Units 1 and 2 for the significance analysis. FWS_3683.

a primary factor in delineating the five analysis units, "physiographic regions[] and the input of species experts" also factored into the decision. FWS_3673.

Second, even to the extent genetic variation played a role in delineating Units 1 and 2, Plaintiffs conflate how genetics factor into dividing the range or evaluating a species' status in a portion of its range for an SPR determination versus evaluating the discreteness or significance of a population for a DPS determination. The ESA definition of "species" allows FWS to consider, for vertebrates, the status of a taxonomic species or subspecies over less than its entire range (i.e., a DPS). 16 U.S.C. § 1532(16). The three elements of a DPS decision are:

> (1) discreteness of the population segment in relation to the remainder of the species to which it belongs; (2) the significance of the population segment to the species to which it belongs; and (3) the population segment's conservation status in relation to the [ESA's] standards for listing.

61 Fed. Reg. 4722, 4725 (Feb. 7, 1996). Genetic differences factor into both the first and second elements. *See id.* In its SPR policy, FWS explained the relationship between DPS and SPR.[13] If the species is endangered or threatened throughout a significant portion of its range, and the population in that significant portion is a valid DPS, FWS will list the DPS rather than the entire taxonomic species or subspecies. *See* 79 Fed. Reg. 37578, 37585-87, 37609 (July 1, 2014).

Plaintiffs fault FWS for not "explaining—or even mentioning—why the genetic variation [of Units 1 and 2] is not significant" under the SPR analysis, Pls.' Br. at 24, but FWS *did* consider and explain the significance of the genetic variation for those units, under the appropriate mechanism of the DPS analysis. For the gopher tortoise, after

---

[13] Although the definition of "significant" in the 2014 SPR policy was invalidated, FWS's view on the relationship between SPR and DPS still stands.

determining that the species did not meet the definition of an endangered or threatened species, FWS performed a DPS analysis for both the western population (Unit 1) and the eastern population (Units 2 through 5). FWS_3684-87. FWS determined those populations each met the DPS criteria for significance and discreteness. FWS_3687. Then, FWS assessed whether each DPS is in danger of extinction or likely to become so within the foreseeable future. FWS_3687-91. FWS concluded the Western DPS (Unit 1) warrants continued listing as a threatened species under the ESA, FWS_3687, but the Eastern DPS (Units 2 through 5) does not warrant listing. FWS_3691. Clearly, FWS did not "simply dismiss [genetic] diversity" as Plaintiffs claim. Pls.' Br. at 24 (quoting *Desert Survivors v. U.S. Dep't of the Interior*, No. 20-cv-06787-JSC, 2022 WL 1539530 at *11 (N.D. Cal. May 16, 2022));[14] *see also id.* at 27 n.15 (attacking SPR analysis for Eastern DPS for allegedly ignoring genetic significance, without acknowledging genetic significance was part of the threshold DPS analysis).

Plaintiffs' allegation of inconsistency between the SPR and DPS analyses is misguided. FWS's long-standing definition of "significance" under the DPS analysis includes, among other things, consideration of "evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon." DPS Policy, 61 Fed. Reg. at 4725. For its DPS analysis of Unit 1, FWS explained that the population segment differed markedly in genetic characteristics from the other populations, and that loss of that genetic diversity would likely impact the species' adaptive capacity, therefore

---

[14] Nor is Plaintiffs' comparison to *Defenders of Wildlife v. Jewell* apt. Pls.' Br. at 25. That court remanded the ESA decision for a wolverine DPS where FWS did not consider lack of genetic diversity as an independent threat acting on the species. 176 F. Supp. 3d 975, 1005-06 (D. Mont. 2016). Yet, that court upheld FWS on a separate challenge to FWS's interpretation of SPR. *Id.* at 1007-10.

resulting "in a significant gap in the gopher tortoise's range if lost." FWS_3686-87. That analysis is completely different from the SPR "significance" analysis that focused on the species' habitat and considered, among other things, whether Units 1 and 2 were a large geographic area relative to the rest of the range. FWS_3658, 3684. Plaintiffs' effort to equate the two analyses fails.

Finally, Plaintiffs muddy FWS's conclusions about the size and quality of habitat in the portion evaluated. Pls.' Br. at 25-26. To start, FWS's "metric for significance" is not "viability," *id.* at 25, but the four considerations described above. These in turn indicate "biological importance to the overall viability" of the species. FWS_3683. Relying on the wrong metric, Plaintiffs posit a new standard: a finding that "units contribute to the rangewide representation and redundancy" of the species "should end the analysis in favor of significance." Pls.' Br. at 25. Plaintiffs' standard would lower the bar for "significant" so much that any level of contribution to rangewide representation and redundancy would qualify, completely diluting the meaning of the word.

Plaintiffs incorrectly allege inconsistency within FWS's conclusions about the quality of the habitat in Units 1 and 2 relative to the rest of the range. Pls.' Br. at 25 (comparing to FWS's discussion of representation and redundancy). But the detailed analysis of habitat quality by unit in the SSA fully supports FWS's conclusion. *See* FWS_3421-25. FWS estimated that Unit 1 contains only about 9,000 acres of high-suitability habitat, and Unit 2 contains about 18,200 acres of high-suitability habitat. FWS_3425. These numbers are indeed low compared to the approximately 54,600 acres

24

of high-suitability habitat in Unit 3, 28,800 acres in Unit 4, and 39,800 acres in Unit 5. *Id.* FWS's conclusion about the quality of habitat in the portion is supported by the record.[15]

Plaintiffs also confuse the separate "status" and "significance" considerations of the SPR analysis. As explained above, "status" considerations include past, present, and future threats on the species. "Significance" considerations look at the biological importance of a specific geographical area. FWS considered the threat of habitat loss and fragmentation from a number of causes to determine the "status" of the species in each analysis unit. FWS_3683. That is completely separate from looking at whether the analysis unit contains high-quality or high-value habitat, or constitutes a large geographic area relative to the remaining portions of the range, to determine the "significance" of each analysis unit. FWS_3683-84. Plaintiffs conflate these distinct considerations. *Cf.* Pls.' Br. at 26 (claiming incorrectly that FWS considered the "threat from habitat degradation" under the "significance" question when FWS actually considered habitat quality due to natural variation in environmental conditions, like soils). In sum, FWS conducted a fulsome analysis as to whether the species should be listed as threatened or endangered in a significant portion of its range and reasonably determined that it should not. This Court should uphold FWS's SPR conclusions.

## III.    FWS Rationally Explained its "Foreseeable Future" Timeframe.

The ESA uses the term "foreseeable future" in its definition of "threatened species" but does not define the term. *See* 16 U.S.C. § 1532(20). In 2009, the Department of

---

[15] *Defenders of Wildlife v. U.S. Fish and Wildlife Service* is not relevant. Pls.' Br. at 26. In that case, the agency used a prior interpretation of "significant" for its SPR analysis, and failed to sufficiently explain how locations of the species seemingly fitting that interpretation did not qualify as SPRs. 584 F. Supp. 3d 812, 826-27 (N.D. Cal. 2022). Here, FWS used a different interpretation, and its conclusion is explained.

Interior's Office of the Solicitor published guidance called an "M-Opinion" on the issue.[16] The M-Opinion concludes that "Congress intended the term 'foreseeable future' to describe the extent to which [FWS] can reasonably rely on predictions about the future in making determinations" about the status of species. *Id.* at 1. "Reliable" does not mean "certain" but, rather, a reasonable degree of confidence in the prediction. *Id.* at 13. The foreseeable future determination "must be rooted in the best available data that allow predictions into the future." *Id.* "[FWS] must look not only at the foreseeability of threats, but also at the foreseeability of the *impact* of the threats on the species." *Id.* at 10 (emphasis added). Data typically relevant to assessing the species' response include factors such as lifespan and reproductive rates. FWS_3662-63. This is the framework that FWS applied to its gopher tortoise foreseeable future analysis.

FWS analyzed future conditions based on input from species experts, generation time for the species, and the amount of reliable information available to project patterns of climate warming, sea level rise, urbanization, and habitat management into the future. FWS_3682. Using the best available scientific data, FWS projected gopher tortoise demographics at 40, 60, and 80 years in the future. *Id.* At all three points, FWS found the data sufficiently reliable to provide a reasonable degree of confidence in the projections, thereby satisfying the foreseeable future standard in the M-Opinion. *Id.*

---

[16] *See* Solicitor's Memorandum on the Meaning of 'Foreseeable Future' in Section 3(20) of the ESA, M-37021 (Jan. 16, 2009) ("M-Opinion "), available at https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37021.pdf (last visited Feb. 28, 2025). "The Court may take judicial notice of government publications and website materials." *Coastal Wellness Ctrs. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018). This M-Opinion is attached to Plaintiffs' brief. ECF No. 29-5. Signed M-Opinions are binding on Department of Interior offices and officials.

Plaintiffs focus on the factors that contribute to assessing the species' response to threats, but they ignore a key part of the foreseeable future analysis—the reliability of the threat projections themselves. Pls.' Br. at 27-28. FWS chose an 80-year timeframe as the limit of the foreseeable future because that is how far out the best available scientific data reliably projected the threats of sea level rise and climate change at the time of FWS's decision. To model sea level rise, FWS used three scenarios predicted by the U.S. National Oceanic and Atmospheric Administration (intermediate-high, high, and extreme) that correspond to two different global emissions scenarios. FWS_3453. Local projections for the two scenarios were available from U.S. Geological Survey sea level monitoring stations across the southeastern United States, providing estimates of sea level rise at decadal time steps until the year 2100 (80 years out). FWS_3453-54. To model the threat of climate change, for each gopher tortoise population, FWS used historical estimates of mean annual temperature, and then simulated step-wise climate warming effects on mean annual temperature each year for three scenarios: (1) a 1.0 degree Celsius increase, (2) a 1.5 degree Celsius increase, and (3) a 2.0 degree Celsius increase in mean annual temperature over the next 80 years (to 2100). FWS_3449. These scenarios were chosen based on Intergovernmental Panel on Climate Change projections, *id.*, which only project out to 2100. *See* FWS_11150-51. Thus, FWS made projections as far out as reliably possible (80 years) within the limitations of the best scientific data available.

Plaintiffs try to undermine FWS's foreseeable future timeframe by pointing to Dr. Folt's statement of discomfort with projecting beyond 80 years "because of uncertainty among models and parameters." Pls.' Br. at 28 (citing FWS_3543). In fact, this statement supports FWS's rationale that the best available data could only make reliable projections

80 years out. Plaintiffs do not point to any better, available science on climate change or sea level rise that would have allowed FWS to project beyond 80 years. *Cf. San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) ("An agency complies with the best available science standard so long as it does not ignore available studies."); *Ctr. for Biological Diversity*, 488 F. Supp. 3d at 1227. Instead, Plaintiffs point out that a gopher tortoise can live beyond 80 years, and gopher tortoise populations persist longer still. Pls.' Br. at 28. But FWS could not wait to make its listing decision until there was a model that could reliably project further into the future. *See Locke*, 776 F.3d at 995 ("The standard does not . . . require an agency to conduct new tests or make decisions on data that does not yet exist.").

FWS chose a foreseeable future timeframe based on the reliability of the best available data on threats to the species. That choice is reasonable and should be upheld.

## IV.    FWS Properly Considered Existing Regulatory Mechanisms.

As required by the ESA, FWS considered the inadequacy of existing regulatory mechanisms. *See* 16 U.S.C. § 1533(a)(1). The decision document extensively discusses five categories of conservation efforts and regulatory mechanisms that are completed or ongoing to mitigate or prevent threats to the gopher tortoise. FWS_3668-71; *see also* FWS_3378-401. For example, the federal government acquires conservation easements and works to restore and maintain gopher tortoise habitat on federal land, FWS_3669-71, like how the Desoto National Forest recently implemented actions to restore longleaf pine on 374,000 acres. FWS_3671. In the section describing synergistic and cumulative effects, FWS described the threats identified as working against the species, then explained how certain conservation efforts—to acquire habitat and retain forest on public

and private lands—"reduces the severity of some of these threats by providing protection of habitat across the landscape, maintaining connectivity between habitat patches, and increasing the opportunity for beneficial habitat management actions now and into the future." FWS_3672. FWS further described how conservation efforts implemented by Federal, State, and private partners occur across the species' range and are considered to have population-level effects. *Id.* Accordingly, FWS incorporated some existing conservation efforts into its analyses of current and future species condition. *See, e.g.*, FWS_3677 (including information about conserved lands in analysis of resiliency by unit).

Of note, FWS analyzed future conditions using only known populations on managed conservation lands, despite possessing data (lacking geospatial information) that other tortoise populations exist outside of those on managed conservation lands. FWS_3680-81. FWS did not rely on private land populations because they lack long-term guaranteed protection from development, and FWS chose not to assume private land conservation efforts would continue into the future. FWS_3680-81. This means FWS's future condition projection—that the species' resiliency will persist 80 years into the future with some reduction in representation and redundancy—is actually a conservative estimate due to starting from lower population numbers than truly exist. FWS_3681.

Plaintiffs' argument about FWS's Policy on Evaluation of Conservation Efforts When Making Listing Determinations ("PECE") is a red herring. Pls.' Br. at 29. The PECE identifies criteria FWS uses to evaluate whether formalized conservation efforts provide certainty of implementation and effectiveness and, thereby, improve the status of the species such that it does not meet the ESA definition of threatened or endangered species. 68 Fed. Reg. 15100 (Mar. 28, 2003). If the conservation efforts are already

29

ongoing, PECE does not apply. In Plaintiffs' cited cases, the courts held that the agency "may not rely on plans for future actions" but "may only consider conservation efforts that are currently operational." *Or. Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1154 (D. Or. 1998); *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 207-08 (D.D.C. 2012) (finding consideration of ongoing Conservation Strategy appropriate). Here, FWS only relied on already "protected conservation lands that [it] expect[s] will be managed for conservation in the future." FWS_3680. FWS explicitly declined to rely on data from lands lacking long-term protection. FWS_3681. Nor did FWS "rely on" translocation of individuals to make its final listing determination. *But see* Pls.' Br. at 30 n.18.

In sum, FWS properly described the existence of many regulatory mechanisms and conservation efforts, then relied on certain ones as a factor for why the gopher tortoise is not in danger of extinction or likely to become so in the foreseeable future.

## REMEDY

FWS's 2022 "not warranted" gopher tortoise determination is rational and supported by the record. However, if the Court finds in Plaintiffs' favor, it should allow for supplemental remedy briefing to address the scope and timing of any remand. If the Court finds for Plaintiffs on the merits and declines to allow remedy briefing, the appropriate remedy is to remand the determination to the agency for further investigation or explanation. *See e.g., Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *NRDC v. Coit*, 597 F. Supp. 3d 73, 95 (D.D.C. 2022).

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Respectfully submitted this 28th day of February, 2025.

LISA L. RUSSELL, Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
S. JAY GOVINDAN, Section Chief
NICOLE M. SMITH, Assistant Section Chief

*/s/ Taylor A. Mayhall*
TAYLOR A. MAYHALL
Trial Attorney (MN Bar No. 0400172)
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 598-3796
Taylor.mayhall@usdoj.gov

*Counsel for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. Counsel of record currently identified on the Mailing Information list to receive e-mail notices for this case are served via Notices of Electronic Filing generated by CM/ECF.

/s/ Taylor A. Mayhall
TAYLOR A. MAYHALL