**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**Jacksonville Division**

<table>
<tr>
<td>

**CENTER FOR BIOLOGICAL DIVERSITY** and **NOKUSE EDUCATION, INC.**,

       *Plaintiffs*,

            v.

**U.S. FISH AND WILDLIFE SERVICE; PAUL SOUZA**, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; and **DOUG BURGUM**, in his official capacity as Secretary of the U.S. Department of the Interior,

       *Defendants*.

</td>
<td>

Case No. 3:23-cv-936-WWB-LLL

</td>
</tr>
</table>

**<u>PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY AND NOKUSE EDUCATION, INC.'S COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO FEDERAL DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

TABLE OF ADMINISTRATIVE RECORD CITATIONS ................................... v

ARGUMENT...................................................................................................... 1

I.    FWS failed to rationally explain why it used a population viability analysis (PVA) that arbitrarily departed from the best available science. .................................... 2

    a.    FWS failed to rationally explain the arbitrary immigration feedback loop present in its analysis. ................................................................................ 2

    b.    FWS failed to explain why it chose its flawed approach to modeling Tortoise maturation rates over a superior option before it. ......................................... 4

II.   Defendants fail to rebut Plaintiffs' arguments that FWS disregarded proven threats from urbanization and habitat destruction................................................ 6

III.  FWS's SPR analysis for the Tortoise is arbitrary and unlawful, and therefore the APA directs the court to vacate and remand It. .................................................... 7

    a.    Defendants' tortured analysis does not support that Congress "delegated" to FWS the job of defining "significant."........................................................... 7

    b.    FWS's definition of significant in the Tortoise Denial cannot stand because it is unreasoned and undermines the ESA. .................................................... 9

    c.    FWS's SPR analysis of Units 1 and 2 is also arbitrary. ............................. 11

IV.   FWS had data to look beyond its arbitrarily brief foreseeable future. ................ 12

V.    Defendants' regurgitated list of regulatory mechanisms does nothing to remedy FWS's failure to determine the *adequacy* of those mechanisms....................... 13

VI.   Remedy............................................................................................................ 14

CONCLUSION .............................................................................................. 15

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Allentown Mack Sales & Serv. v. NLRB*,
   522 U.S. 359 (1998) ............................................................................................ 2

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ......................................................................... 15

*Auto-Owners Ins., Co. v. AAA Disc. Homes, LLC*,
   No. CV 622-043, 2024 U.S. Dist. LEXIS 48463 (S.D. Ga. Mar. 19, 2024) ................. 6

*Batterton v. Francis*,
   432 U.S. 416 (1977) ............................................................................................ 8

*BBX Capital v. FDIC*,
   956 F.3d 1304 (11th Cir. 2020) ................................................................... 6, 11

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   781 F.3d 1271 (11th Cir. 2015) ......................................................................... 15

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) ..................................................................................... 5, 10

*Columbia Falls Aluminum Co. v. EPA*,
   139 F.3d 914 (D.C. Cir. 1998) ........................................................................... 3

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   488 F. Supp. 3d 1219 (S.D. Fla. 2020) ....................................................... 6, 15

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   690 F. Supp. 3d 322 (S.D.N.Y. 2023) ...................................................... 10, 14

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) ............................................................................ 5

*Defs. of Wildlife v. Norton*,
   258 F.3d 1136 (9th Cir. 2001) ............................................................................ 9

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
   733 F.3d 1106 (11th Cir. 2013) ...................................................................... 1, 2

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ................................................................................................ 5

*EME Homer City Generation, L.P. v. EPA*,
   795 F.3d 118 (D.C. Cir. 2015) ......................................................................... 15

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ......................................................................................... 15

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ............................................................................................ 8

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ................................................................................... 7, 8, 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .................................................................................. 2, 5, 7

*Nat'l Ass'n for Surface Finishing v. EPA,*
  795 F.3d 1, 18 (D.C. Cir. 2015) ..................................................................... 3

*NRDC v. Coit,*
  597 F. Supp. 3d 73 (D.D.C. 2022) ............................................................... 15

*NRDC v. EPA,*
  489 F.3d 1250 (D.C. Cir. 2007) ................................................................... 15

*NRDC v. Rauch,*
  244 F. Supp. 3d 66 (D.D.C. 2017) ............................................................. 2, 3

*PG&E v. FERC,*
  113 F.4th 943 (D.C. Cir. 2024) ....................................................................... 9

*Pres. Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs,*
  87 F.3d 1242 (11th Cir. 1996) ......................................................................... 4

*San Luis & Delta-Mendota Water Auth. v. Locke,*
  776 F.3d 971 (9th Cir. 2014) ......................................................................... 13

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ........................................................................................... 5

*Tenn. Valley Auth. v. Hill,*
  437 U.S. 153 (1978) ....................................................................................... 13

*WildEarth Guardians v. Haaland,*
  561 F. Supp. 3d 890 (C.D. Cal. 2021) ............................................................ 7

*William Bros., Inc. v. Pate,*
  833 F.2d 261 (11th Cir. 1987) ......................................................................... 5

## **Statutes**

5 U.S.C. § 706(2)(A) .......................................................................................... 7

16 U.S.C. § 1533(a)(1) ....................................................................................... 8

29 U.S.C. § 213(a)(15) ....................................................................................... 8

42 U.S.C. § 5846(a)(2) ....................................................................................... 8

42 U.S.C. § 7412(n)(1)(A) .................................................................................. 8

## **Federal Register**

68 Fed. Reg. 15100 (Mar. 28, 2003) ............................................................... 14

79 Fed. Reg. 37578 (July 1, 2014) .................................................................. 11

84 Fed. Reg. 12223 (Apr. 4, 2019) .................................................................. 11

86 Fed. Reg. 30688 (June 9, 2021) ................................................................... 1

89 Fed. Reg. 85294 (Oct. 25, 2024) .................................................................. 1

**TABLE OF ADMINISTRATIVE RECORD CITATIONS**

| Document | Bates Range | Brief Page Nos. |
|---|---|---|
| U.S. Fish and Wildlife Service, Gopher Tortoise Species Status Assessment (SSA) Report (Aug. 2021) | AR_003300-003587 | 3, 4, 6, 7, 12, 14 |
| U.S. Fish and Wildlife Service, Federal Register Notice FWS-R4-ES-2009-0029-0069 (Oct. 12, 2022) | AR_003657-003691 | 6, 10, 11, 12, 13, 14 |
| Justin D. Congdon et al., *Delayed Sexual Maturity and Demographics of Blanding's Turtles (Emydoidea blandingii): Implications for Conservation and Management of Long-Lived Organisms*, 7(4) Conserv. Biol. 826–833 (1993) | AR_004966-004974 | 3 |
| Brian Folt et al., *Using predictions from multiple anthropogenic threats to estimate future population persistence of an imperiled species*, 36 Global Ecol. and Conserv. e02143 (2022) | AR_011116-011136 | 3, 4 |
| William V. Sweet et al., *Global and Regional Sea Level Rise Scenarios for the United States: Updated Mean Projections and Extreme Water Level Probabilities Along U.S. Coastlines*, NOAA National Ocean Service (2022) | AR_011171-011281 | 13 |
| Bruce E. Kendall et al., *Persistent problems in the construction of matrix population models*, 406(24) Ecol. Model. 33–43 (2019) | AR_011784-011794 | 4, 5 |

**ARGUMENT**

This case is about ensuring that Defendant federal agencies complied with Congress's directives in the Endangered Species Act (ESA) and engaged in rational decisionmaking required by the Administrative Procedure Act (APA) when the U.S. Fish and Wildlife Service (FWS) denied ESA protections (Denial) to the gopher tortoise (Tortoise). Rather than respond to many of Plaintiffs' arguments with record evidence that FWS complied with these laws, Defendants largely rest upon agency deference. Defendants' Opposition (Opp'n), ECF No. 36, at 2. But courts may defer to agency judgment only "as long as its conclusions are rational" and draw from the data before it. *Defs. of Wildlife v. U.S. Dep't of the Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013).

Here, FWS's analysis warrants no deference because it undertook an arbitrary analysis in its PVA model that departed from the best available science, unlawfully concluded that the Tortoise was not endangered or threatened in a significant portion of its range, unreasonably limited its analysis of the Tortoise's future condition, and failed to consider the inadequacy of existing regulatory mechanisms. Plaintiffs' Brief (Pls.' Br.), ECF No. 29. In view of these errors, Plaintiffs do not "ask the Court to substitute its judgment for FWS's," Opp'n at 2, but rather to vacate and remand to FWS for a new decision that complies with the ESA and APA, Pls.' Br. at 30. Doing this will likely lead to a decision that the Tortoise warrants ESA protection, in which case FWS will continue to work with public and private partners to secure a future for this keystone species.[1]

---

[1] *See, e.g.*, 89 Fed. Reg. 85294, 85335–38 (Oct. 25, 2024) (cooperative conservation of red-cockaded woodpecker with private landowners via safe harbor agreements, habitat conservation plans, conservation programs, and exemptions for activities that use best management practices (BMPs)); 86 Fed. Reg. 30688, 30694 (June 9, 2021) (exempting forestry activities that use BMPs from take restrictions for Neuse River waterdog).

I.    **FWS failed to rationally explain why it used a population viability analysis (PVA) that arbitrarily departed from the best available science.**

Rather than defend FWS's illogical PVA process, Defendants distort Plaintiffs' arguments and urge blind deference.[2] But it is foundational that "the process by which [an agency] reaches [its] result[s] must be logical and rational." *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). And the Court cannot defer to arbitrary decisionmaking. *Defs. of Wildlife v. Navy*, 733 F.3d at 1115.

a.    **FWS failed to rationally explain the arbitrary immigration feedback loop present in its analysis.**

Defendants do not directly refute Plaintiffs' argument that FWS's analysis in the PVA model arbitrarily introduced a feedback loop that predicted biologically impossible population changes. *See* Pls.' Br. at 12–20. This feedback loop is not a mere "limitation," Opp'n at 9, but a fundamental error that formed the basis of FWS's Denial. Because Defendants fail to refute the error, the Court is left to find that FWS "either committed the logical error that Plaintiffs have identified or, at the very least, . . . failed to explain why it has not done so." *NRDC v. Rauch*, 244 F. Supp. 3d 66, 89 (D.D.C. 2017).

Defendants also argue that "FWS did not rely on the sensitivity analysis results to make the final listing determination," Opp'n at 12, but Plaintiffs did not say this. Rather, Plaintiffs pointed out that FWS's own findings illustrate how FWS's arbitrary analysis produced arbitrary results, Pls.' Br. at 13–14. Defendants offer no explanation for how the "permanent move of gopher tortoises from one population to another" could create these arbitrarily divergent results. Opp'n at 10. And they certainly have not provided a

---

[2] Notably, Defendants also cite Dr. Jeffrey Goessling in support of their argument, Opp'n at 10, but seek to prevent him from participating as an amicus in this case, ECF No. 32.

"full analytic defense," of how even "very high immigration" alone could more than double the population size of a long-lived, slow-growing species over the course of only 80 years. *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (cleaned up) (finding EPA's reliance on a flawed model was arbitrary); AR_003473; AR_004973. Even if the PVA model was "the best available way" to analyze the Tortoise's status, Opp'n at 10, which it was not,[3] FWS did not rationally explain the contradiction between the PVA analysis and the best available science about Tortoise life history. *See* Pls.' Br. at 14.

Defendants also attempt to avoid explaining the contradictory outcomes from the SSA Model and Folt et al. (2022), Pls.' Br. at 14, by claiming such comparisons are "not apples-to-apples," Opp'n at 12. But Defendants refer to the SSA and Folt et al. (2022) interchangeably when describing methodology, Opp'n at 10, 12, and Dr. Folt himself described the functional equivalency of the models in his publication. AR_011116 (explaining that the published analysis was "*built as part of the SSA* for . . . the gopher tortoise" (emphasis added)). They are foundationally the same. Pls.' Br. at 9. Even if they differ in minute ways,[4] Defendants failed to explain the different outcomes, or more importantly, why FWS relied on findings that departed from Folt et al. (2022) so significantly. *Rauch*, 244 F. Supp. 3d. at 94 (*quoting Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 18 (D.C. Cir. 2015)) ("[E]ven in the most technical cases, the Service must still 'provide[] a complete analytic defense' of its assumptions and methodology.").

_____

[3] Defendants absurdly argue that the Court cannot "substitute its judgment for FWS's," Opp'n at 2, yet also demand Plaintiffs "point[] to any better methods existing at the time," *id.* at 11. Plaintiffs explained the error, but FWS's failure to "show its work," Pls.' Br. at 15 n. 6, precludes their ability to describe an alternate method in detail.
[4] *See* Opp'n at 12 (noting small differences in selection method for immigration pool).

In short, Plaintiffs do not suggest that FWS should have "ignor[ed] immigration entirely," Opp'n at 11; however, FWS must analyze it in a way that is rational and consistent with the best available science FWS compiled in the SSA regarding Tortoise life history. Pls.' Br. at 6–7, 12–13. Absent rational analysis, the Denial is unlawful.

### b. FWS failed to explain why it chose its flawed approach to modeling Tortoise maturation rates over a superior option before it.

Defendants also fail to logically explain why FWS used an arbitrary analysis of Tortoise maturation when it had better available science in Kendall et al. (2019), instead citing an extra-record study mischaracterizing Kendall et al. (2019) and providing counsel's post-hoc rationalizations. Opp'n at 12–14. First, Defendants claim that Lefkovich (1965), a study that is not in the administrative record,[5] supports FWS's analysis of Tortoise maturation, Opp'n at 13. As a preliminary matter, because the Court's review is "based on the record the agency presents to the reviewing court." *Pres. Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996), the Court cannot rely on Defendants' extra-record citation to supply an explanation FWS failed to supply. But even if the Court did, Lefkovitch (1965) only supports use of "stage-based population model[s]," Opp'n at 13, which Plaintiffs do not take issue with. Lefkovich (1965) does not support FWS's decision to flatten Tortoise age within each stage. *See* Pls. Br. at 16–17 (citing Kendall et al. (2019), AR_011790, which explains how the "flat-age-within-stage" approach irrationally overestimates growth rate). As Defendants admit, Lefkovitch (1965) was only "recently applied to gopher tortoise populations in a 2021 article," Opp'n at 12, and so it is clearly not the "established way to project populations" as they claim, *id.* at 13.

---

[5] Folt et al. (2022) cites the paper, but it is not in the record. AR_011118; AR_003524.

Defendants then unconvincingly argue—without any record citation—that "FWS considered all materials in its amended administrative record, including Kendall et al. 2019. At the time, Kendall et al. 2019 was a new study, whereas the Lefkovitch model had been established in the scientific community for decades. FWS chose the method with existing scientific support." Opp'n at 13. First, Defendants' arguments are not supported by the administrative record and "appear[] to be nothing more than an agency's convenient litigating position." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212–13 (1988); *William Bros., Inc. v. Pate*, 833 F.2d 261, 265 (11th Cir. 1987). The Court must judge the reasonableness of FWS's decision on the "grounds upon which . . . the record discloses," *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), not on "counsel's *post hoc* rationalizations," *State Farm*, 463 U.S. at 50.[6]

Furthermore, Kendall et al. (2019) does not lack "existing scientific support," as Defendants imply.[7] Opp'n at 13. Although Kendall is a relatively recent publication, it does not report any new methods but rather reiterates well-founded critiques of the flat-age-within-stage method as applied here.[8] In addition to explaining the flaws of the structure, Kendall's review of recent literature found that the use of the flat-age-within-stage approach is rare (7% of examined studies), while other preferred methods are much more common (36%). AR_011789. Without rational explanation on the record,

---

[6] Allowing FWS to make "belated justifications" would upset the APA's standard of review and unfairly require the Center and the Court to "chase a moving target." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068-69 (9th Cir. 2018) (remanding listing decision where the decision did not discuss "[one] study's data that contradicts [another] study").
[7] This "newness" critique undercuts Defendants' own argument supporting FWS's immigration analysis, which they call a "new contribution to the field." Opp'n at 12.
[8] *See, e.g.,* AR_011794 (Kendall et al. (2019) citing Caswell (2001), a study in a textbook on modeling that warned against using flat-age-within-stage decades ago).

FWS "may not disregard available scientific evidence that is in some way better than the evidence [it] relies on." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 488 F. Supp. 3d 1219, 1227 (S.D. Fla. 2020) (cleaned up) (vacating a listing decision where there was "a missing explanatory link" to support FWS's reliance on outdated data).

## II.     Defendants fail to rebut Plaintiffs' arguments that FWS disregarded proven threats from urbanization and habitat destruction.

In "boil[ing] down" Plaintiffs' arguments, Opp'n at 14, Defendants conveniently boiled away the main one—that FWS found urbanization directly threatens Tortoises by destroying habitat but failed to model *or otherwise analyze* that threat, Pls.' Br. at 17–19. Plaintiffs assume this "failure to respond to [an] argument[] in [their] motion for summary judgment indicates no opposition."[9] *Auto-Owners Ins., Co. v. AAA Disc. Homes, LLC*, No. CV 622-043, 2024 U.S. Dist. LEXIS 48463, at *35 (S.D. Ga. Mar. 19, 2024).

Likewise, Defendants dodge Plaintiffs' argument that FWS did not cite any reliable data in the administrative record for its conclusion that "*sufficient quality and quantity of habitat* remains to provide adequate resiliency to contribute to the viability of the species," AR_003682 (emphasis added). *See* Pls.' Br. at 19 n. 9; Opp'n at 16 n. 9. If Defendants' claim is true that FWS "assessed resiliency using estimated abundance as

---

[9] Defendants' claim that FWS "did not have geospatial or abundance data available" to model Tortoises on private lands, Opp'n at 14–15, presupposes that FWS can only consider available data when it can be modeled. The Court should not accept FWS's self-imposed limitations. Indeed, FWS's own analyses show that it is capable of inferring the status of Tortoises on private lands without modeling. AR_003682 (suggesting more Tortoises may exist in the future because "only existing populations on protected lands were modeled"). Because FWS's Denial relied on future "population trends," AR_003456; AR_003680 (predicting "60–61 percent" declines in local populations by 2080), FWS "entirely failed to consider an important aspect of the problem" when it did not discuss or at least acknowledge that omitting low-viability populations from its analysis would obscure what is, in reality, a steeper trend toward extinction. *BBX Capital v. FDIC*, 956 F.3d 1304, 1314–15 (11th Cir. 2020); *see* Pls.' Br. at 19–20.

a proxy for habitat because it lacked consistent, reliable [habitat] estimates," Opp'n at 16 n. 9, then FWS's Denial should contain no reference to habitat quality and quantity at all. But it does. Thus, Defendants must—and have heretofore failed to—provide the record evidence in support of FWS's conclusion, which is arbitrary and unlawful.[10]

### III. FWS's SPR analysis for the Tortoise is arbitrary and unlawful, and therefore the APA directs the court to vacate and remand It.

The ESA does not "delegate" authority to FWS to assert its arbitrary and unlawful interpretation of the term "Significant," and the APA directs courts to vacate agency actions like this one. Though Defendants quibble over the scope of the Court's review under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), even the most deferential standard set forth in the now-defunct *Chevron* test would not permit the Court to uphold FWS's SPR analysis for the Tortoise. As Plaintiffs explained, FWS's analysis runs contrary to the ESA, arbitrarily departs from the best available science, and fails to consider important aspects of the problem. Pls.' Br. at 20–27. Each deficiency is an independent basis vacatur and remand. *See* 5 U.S.C. § 706(2)(A).

### a. Defendants' tortured analysis does not support that Congress "delegated" to FWS the job of defining "significant."

Defendants make a poor case that the "best reading" of the ESA is that it delegates discretionary authority to FWS to define "significant" on a case-by-case basis.

---

[10] Defendants accuse Plaintiffs of "misrepresenting" the record relating to FWS's failure to consider habitat quality through the Gopher Tortoise Council's (GTC) minimum population viability guidelines, Opp'n at 15, but Plaintiffs provided direct record quotations, Pls.' Br. at 18 n. 8. While Defendants argue that the GTC "explicitly rejected applying the minimum viable population guidelines as Plaintiffs do," Opp'n at 15–16, it was FWS—not Plaintiffs—who chose to use the GTC guidelines to define resiliency. AR_003416–17. FWS may not "selectively rely on portions of the[] stud[y]" to support its non-listing determination." *WildEarth Guardians v. Haaland*, 561 F. Supp. 3d 890, 900 (C.D. Cal. 2021) (remanding not warranted finding); *State Farm,* 463 U.S. at 43.

*See* Opp'n at 18–19 (citing *Loper Bright*, 603 U.S. at 394–95). The Court cannot reasonably find that Congress has "expressly delegated" to FWS "the authority to give meaning to a *particular statutory term*"—in this case, the term "significant." *Loper Bright*, 603 U.S. at 394–95 (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)) (emphasis added). Defendants' argument that the ESA "suggest[s] that Congress intended to delegate" statutory interpretation, Opp'n at 18, is a far cry from an "express delegation." As Defendants acknowledge, the ESA expressly directs FWS to "determine whether any species is an *endangered species or a threatened species* because of any of the [five] factors," Opp'n at 18 (quoting 16 U.S.C. § 1533(a)(1) (emphasis modified)), not to define what portion of a species' range is "significant." This is distinguishable from examples in *Loper Bright* where Congress explicitly directed that statutes' terms be read "as such terms are defined and delimited by regulations of the Secretary," 29 U.S.C. § 213(a)(15), or "as defined by regulations which the Commission shall promulgate," 42 U.S.C. § 5846(a)(2). 603 U.S. at 395 n.5.

Congress has also not empowered FWS to "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Id.* at 395 n.6 (cleaned up) (providing as an example a statute that directs EPA to regulate power plants "if the Administrator finds such regulation is appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A)); *see* Opp'n at 18 (citing *Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J., concurring in the judgment) ("'[O]pen-ended terms' like 'reasonable,' 'appropriate,' 'feasible' or 'practicable'" "afford agencies broad policy discretion")). The difference is apparent in the very structure of the statutory language. Unlike the terms "reasonable," "appropriate," and "practicable,"

which serve to modify or set limits on an agency's ability to interpret through regulation, the term "significant" does not set limits on FWS's actions.[11]

Rather, as Defendants' note, "the phrase 'significant portion of its range' is not defined in the ESA, and courts have concluded that the phrase is ambiguous." Opp'n at 17. Under *Loper Bright*, reviewing courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous" but must determine the "best reading" of it. 603 U.S. at 413. Defendants' strained interpretation does not unravel this holding, and the best reading of "significant portion of its range" is one that does not conflate the definitions of a species' "entire range" with "significant portions" of that entire range. *See, e.g.*, *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1144–45 (9th Cir. 2001) (establishing Congress's meaning by looking to legislative history of the ESA).[12]

### b. FWS's definition of significant in the Tortoise Denial cannot stand because it is unreasoned and undermines the ESA.

Even if the Court were to find that Congress had delegated authority to FWS to define "significant"—which it has not, Defendants recognize that the APA requires that courts "ensure[ ] the agency has engaged in 'reasoned decisionmaking.'" Opp'n at 18 (quoting *Loper Bright*, 603 U.S. at 371) (cleaned up). As Plaintiffs explained, FWS's definition is arbitrary and unreasoned because it conflates the "entire" and "significant

---

[11] Nor does the ESA tell FWS to "'fill up the details' of a statutory scheme." *Loper Bright,* 603 U.S. at 395.

[12] Defendants' citation to *Pacific Gas & Electric Company v. Federal Energy Regulatory Commission*, does not alter the outcome. There, the D.C. Circuit found that FERC's statutory interpretation "cannot be squared with the statutory text," 113 F.4th 943, 945 (D.C. Cir. 2024),and vacated and remanded to the agency to make a new decision— consistent with the Court's opinion—because "the application of the statutory text to the meaning of the [statutory term] may 'rest on factual premises within the agency's expertise." *Id.* at 951. It did not remand to the agency to interpret the statute on its own.

portion" standards. Pls.' Br. at 20–23. For this reason, Defendants' argument that FWS "gave effect to the clear intent of Congress" is unfounded. *See* Opp'n at 18.

Defendants attempt to dodge Plaintiffs' argument by downplaying *FWS's own stated definition* of "significant" and focusing on what factors FWS considered in assessing whether portions of the Tortoise's range met the definition. Opp'n at 19. But this does not change the fact that FWS defined "significant" to mean whether a portion "is significant based on its biological importance to the overall viability of the gopher tortoise." AR_003683. This definition conditions the significance of a portion on its impact to the viability of the entire species, and courts have repeatedly held that such an interpretation cannot stand.[13] Pls.' Br. at 21–23.

The Court should disregard Defendants' "convenient litigating position" here, which is not supported by the record. *Bowen*, 488 U.S. 204 at 212–13. If FWS intended to consider "differences in habitat for a life-history function, not whether an entire life-history function is contained within a portion," Opp'n at 20, it should have said so in the Denial. But the Denial did not say that FWS would consider whether a portion may "contain[ ] a certain *type* of food or nesting site," *id.*, it said it would consider whether a portion may "*contain habitat that is essential to a specific life-history function for the species that is not found in the other portions*," AR_003683 (emphasis added). This inquiry clearly conflates the "entire range" and SPR analyses.[14]

---

[13] Though Plaintiffs first offered one example to illustrate FWS's arbitrary interpretation of "significant," they did not "ignore that FWS applied four considerations," Opp'n at 20. They detailed why FWS's analysis of each of the four was arbitrary. Pls.' Br. at 23–26.

[14] *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 690 F. Supp. 3d 322, 345 (S.D.N.Y. 2023), is distinguishable from the facts here. There, FWS considered whether the eastern hellbender was "important in terms of the resiliency, redundancy, *or*

**c. FWS's SPR analysis of Units 1 and 2 is also arbitrary.**

Defendants misapprehend Plaintiffs' arguments regarding the SPR analysis for Units 1 and 2. First, Plaintiffs do not argue that "FWS's analysis units are only based on genetic differences," Opp'n at 21. Plaintiffs argue—and Defendants concede—that genetics were "a primary factor in delineating the five analysis units." Opp'n at 22; Pls.' Br. at 24 (citing AR_003678). Accordingly, it is arbitrary for FWS to analyze the significance of two of those units without explaining—or even mentioning—why the genetic variation is not significant. Pls.' Br. at 24–25.

Citing FWS's SPR policy, Defendants appear to respond that FWS could only have considered genetic variation in its Distinct Population Segment (DPS) analysis, Opp'n at 22; this cannot be so. FWS's SPR policy acknowledges that "genetic data" are among the data that "may be relevant to evaluating the relative contribution of a portion of its range to the viability of the species." 79 Fed. Reg. 37578, 37600–01 (July 1, 2014).[15] Given that FWS identified genetics as a primary factor in developing the analysis units under consideration in the SPR analysis, AR_003678, and that genetic considerations are relevant to an SPR analysis, 79 Fed. Reg. at 37600, FWS's failure to analyze or even mention genetics in its SPR analysis represents a failure to consider an important aspect of the problem.[16] *BBX Capital*, 956 F.3d at 1314.

---

representation of the species," 84 Fed. Reg. 12223,13230 (Apr. 4, 2019) (emphasis added); here, FWS considered importance to the species' overall viability. AR_003683.
[15] *See also* 79 Fed. Reg. at 37583 (describing "a number of circumstances in which [FWS] might determine a species is 'significant,'" including when "the population in the SPR contains important elements of genetic diversity"); *id.* at 37593 (describing when FWS "specifically considered geographic barriers and genetic diversity in [an] evaluation of whether portions of the [Queen Charlotte goshawk's] range could be 'significant'").
[16] Discussion of genetics in the DPS analysis cannot rectify this omission. Opp'n at 23.

11

Second, with regard to habitat quality, Plaintiffs agree that the analysis should relate back to FWS's own standard—whether Units 1 and 2 are "significant based on [their] biological importance to the *overall viability of the gopher tortoise*." AR_003683; Opp'n at 24. Because FWS defined viability using the 3Rs, AR_003319–21, and then developed the five analysis units to capture "the rangewide representation and redundancy" of the Tortoise, AR_003684, it naturally follows that losing Units 1 and 2 would reflect a biologically important loss for the Tortoise's overall viability.[17] If the Court were to accept Defendants' argument that FWS's own analysis has "lower[ed] the bar for 'significant'" to the point where it "dilute[s] the meaning of the word," Opp'n at 24, that too would warrant vacatur and remand for a rational analysis.

Third, Plaintiffs again agree with Defendants that "'status' considerations include past, present, and future threats [to] the species." Opp'n at 25. That is precisely why it was arbitrary for FWS to determine that Units 1 and 2 were not significant because they contain "lower quality or less extensive habitat," AR_003684. Low quality and reduced habitat are direct results of the primary threats to the Tortoise—"habitat destruction and lack of habitat management." AR_003368; AR_003683 (observing "less habitat management" in Units 1 and 2). Therefore, Plaintiffs respectfully posit that it is FWS who "conflate[d] these distinct considerations," Opp'n at 25, rendering the Denial arbitrary.

## IV. FWS had data to look beyond its arbitrarily brief foreseeable future.

Given the Tortoise's long life-span and available data regarding threats beyond the year 2100, the ESA required FWS to define the foreseeable future beyond 80 years. Defendants are correct that FWS's M-Opinion does not require certainty, Opp'n at 26; it

---

[17] This is particularly true where FWS delineated the analysis units based on "environmental conditions" like soil characteristics. Pls.' Br. at 25 (citing AR_003678).

only requires data "sufficient to provide a reasonable degree of confidence in the prediction, *in light of the conservation purposes of the Act*." ECF No. 29-5 at 13 (emphasis added). FWS *had* climate data and predictions beyond 2100 (80 years). *E.g.*, AR_011183 (describing projected global sea level rise between 0.8–3.8 meters in 2150). Defendants' assertion that "FWS found the data [it relied on in the Denial] sufficiently reliable," Opp'n at 26, fails to explain why FWS did not rely on other available information before it that predicted threats much farther into the future. Given the ESA's purpose "to halt and reverse the trend toward species extinction," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978), the ESA required FWS to base its decision on available data beyond 80 years or to rationally explain why it did not. FWS failed to do either.[18]

**V.    Defendants' regurgitated list of regulatory mechanisms does nothing to remedy FWS's failure to determine the *adequacy* of those mechanisms.**

Defendants have not directly rebutted Plaintiffs' arguments that FWS failed to analyze the *inadequacy* of existing regulatory mechanisms, instead simply listing regulatory mechanisms again without showing where in the record FWS determined their *adequacy*. *See* Opp'n at 28–30. Although Defendants point to FWS's finding that land conservation "reduces the severity of some of these threats," AR_003672, it does not explain how that reduction compares to the magnitude of the threat, nor whether the reduction is "adequate" to address the risk of extinction.

---

[18] Plaintiffs do not assert that FWS must "wait to make its listing decision until there was a model that could reliably project further into the future." Opp'n at 28. Unlike in *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014), the data *exists and was before FWS*, yet FWS failed to rationally explain why it did not use the data—particularly in light of the ESA's conservation purpose. Defendants provide no legal support for their suggestion that the ESA requires FWS to use models to consider available data—this is because there is no such requirement.

Moreover, Defendants' assertion that the PECE does not apply to "conservation efforts [that] are already ongoing," Opp'n at 29, is untrue. As FWS explained in the PECE Policy, it "applies to those formalized conservation efforts that have not yet been implemented *or have been implemented, but have not yet demonstrated whether they are effective at the time of a listing decision*." 68 Fed. Reg. 15100, 15113 (Mar. 28, 2003). In other words, FWS can rely on existing conservation efforts, but it must first analyze whether they are certain to be effective. *Id.* This was true for habitat management, which FWS relied on in its Denial. Pls.' Br. at 39–30. Likewise, it is true for translocation efforts because FWS *did* rely on translocated Tortoise populations both through its PVA model, AR_003473,[19] and directly in its Denial, AR_003690 (concluding that "conservation measures including translocation . . . have contributed to the improved condition of the species").[20] To rely on these measures, FWS was required to use PECE to determine they're certain to occur *and* certain to be effective—but it did not.[21]  But "FWS point[ed] to no evidence or data to support  that the conservation programs will be effective," so its "reliance on the conservation efforts rendered unlawful its" Denial. *Ctr. for Biological Diversity*, 690 F. Supp. 3d at 342–43.

## VI.    Remedy

Because vacatur and remand is the "ordinary APA remedy" if the Court finds FWS's Denial is unlawful or arbitrary, supplemental briefing is not necessary. *Black*

---

[19] FWS stated that it "included long-term recipient sites in [the] population projections, although there are several assumptions . . . made when including these data," as "there are still uncertainties about [translocation's] efficacy." AR_003473.

[20] Defendants even admit that FWS used this conservation-measures analysis to find they "improved the condition of the species." Opp'n at 15 n. 8 (citing AR_003689–90).

[21] FWS's decision to omit the majority of vulnerable Tortoise populations on private lands obscures even greater anticipated future population declines. *Supra* p. 6 n. 9.

*Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015); *see Ctr. for Biological Diversity*, 488 F. Supp. 3d at 1227 (vacating and remanding ESA denial that was arbitrary and unlawful).[22] In any event, it is "clear the agency's error incurably tainted the agency's decisionmaking process" such that "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" favors vacatur. *Black Warrior Riverkeeper*, 781 F.3d at 1290 (citing *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993)). Vacating an ESA "not warranted" finding has no "disruptive consequences" that weigh against this remedy. *Id.* Absent an order directing FWS to publish a new final decision by a date certain, remand would be "in effect, an indefinite stay of the effectiveness of the court's decision," as FWS would have no incentive to act in a reasonable time. *NRDC v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) (citation omitted); *see also EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) ("[R]emand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule.").

## CONCLUSION

Plaintiffs respectfully ask the Court to rule in their favor on their motion and to vacate and remand FWS's Denial so that the agency may issue a new 12-month finding for the Tortoise within 12 months of this Court's Order.

---

[22] *NRDC v. Coit* agreed that "unsupported agency action normally warrants vacatur" before applying the *Allied Signal* test, 597 F. Supp. 3d 73, 95–96 (D.D.C. 2022), which supports vacatur here. *Fla. Power & Light Co. v. Lorion* is inapt, as it merely observed that APA cases are resolved on an administrative record when ascertaining subject-matter jurisdiction for a claim arising under the Hobbs Act. 470 U.S. 729, 746 (1985).

Respectfully submitted this 21st day of March, 2025.

*/s/ Elise Pautler Bennett*
ELISE PAUTLER BENNETT
Florida Bar No. 106573
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Telephone: (727) 755-6950
Fax: (520) 623-9797
Email: ebennett@biologicaldiversity.org


*/s/ Ragan Edward Whitlock*
RAGAN EDWARD WHITLOCK
Florida Bar No. 1034177
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Telephone: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

*Counsel for Plaintiffs Center for Biological Diversity and Nokuse Education, Inc.*