IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Jacksonville Division

**CENTER FOR BIOLOGICAL DIVERSITY** and **NOKUSE EDUCATION, INC.**,

*Plaintiffs*,

v.

**U.S. FISH AND WILDLIFE SERVICE**, et al.,

*Defendants*.

Case No. 3:23-cv-936-WWB-LLL

# REPLY IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

                                                                                               **Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.     FWS Used Best Available Science When Applying the PVA Model. .................... 2

         A.      Immigration ................................................................................................... 2

         B.      Maturation Rate ............................................................................................ 3

         C.      Threat of Urbanization ................................................................................. 5

    II.    FWS's SPR Analysis Is Reasonable and Should Be Upheld. .............................. 7

    III.   FWS Chose a Reasonable Foreseeable Future Timeframe. ......................... 10

    IV.   FWS Considered the Inadequacy of Existing Regulatory Mechanisms. ......... 10

REMEDY……………………………………………………………………………………..12

CONCLUSION ................................................................................................................ 12

# TABLE OF AUTHORITIES

**Case** **Page(s)**

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ............................................................................... 4, 5

*Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015)……………………………………………………12

*Ctr. for Biological Diversity ("CBD") v. FWS*,
  690 F. Supp. 3d 322 (S.D.N.Y. 2023) ...................................................................... 11

*Defs. of Wildlife v. Jewell*,
  70 F. Supp. 3d 183 (D.D.C. 2014)……………………………………………..…..3

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020)…………………………………………………………………12

*Desert Survivors v. U.S. Dep't of the Interior*,
  321 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................................................. 7, 8

*Ins. Mktg. Coal. Ltd. v. FCC*,
  127 F.4th 303 (11th Cir. 2025)…………………………………………………..12

*Lavigne v. Herbal Life, Ltd.*,
  967 F.3d 1110 (11th Cir. 2020) ................................................................................. 1

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023) .................................................................................... 5

*N.C. Fisheries Ass'n v. Gutierrez*,
  518 F. Supp. 2d 62 (D.D.C. 2007) ............................................................................ 2

*Nat. Res. Def. Council v. U.S. Army Corp. of Eng'rs,*
  99CV2899, 2001 WL 1491580 (S.D. Fla. June 28, 2001) ......................................... 5

*Save the Manatee Club v. EPA*,
  6:22-cv-868-CEM-LHP, 2023 WL 4195043 (M.D. Fla. May 24, 2023) ......................... 4

*SOSS2, Inc. v. U.S. Army Corps of Eng'rs*,
  403 F. Supp. 3d 1233 (M.D. Fla. 2019) .................................................................... 5

*Texas v. EPA*,
  91 F.4th 280 (5th Cir. 2024) ...................................................................................... 2

*W. Flagler Assocs. v. City of Miami*,
   407 F. Supp. 3d 1291 (S.D. Fla. 2019) ........................................................................ 1

**Statutes**

16 U.S.C. § 1531(b) ................................................................................................... 8

16 U.S.C. § 1533(a)(1)(D)……………………………………………………………………11

16 U.S.C. § 1533(b)(1)(A)……………………………………………………………………  3

**Federal Register**

68 Fed. Reg. 15100 (Mar. 28, 2003) ........................................................................ 11

## **TABLE OF REFERENCES AND ACRONYMS**

| | |
|---|---|
| FWS_### | Page citation to U.S. Fish and Wildlife Service's amended administrative record lodged on June 14, 2024 (ECF No. 19) |
| DPS | Distinct Population Segment |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| PECE | Policy on Evaluation of Conservation Efforts |
| PVA | Population Viability Analysis |
| SLEUTH | Slope, Land Use, Exclusion, Urban, Transportation, and Hill-shade model |
| SPR | Significant Portion of Its Range |
| SSA | Species Status Assessment |

## INTRODUCTION

In October 2022, the U.S. Fish and Wildlife Service ("FWS") issued a determination on the status of the gopher tortoise under the Endangered Species Act ("ESA"): the Western distinct population segment ("DPS") of gopher tortoise warrants continued listing as a threatened species but listing is not warranted for the species rangewide or for the Eastern DPS. Before this Court is Plaintiffs' challenge to the rangewide "not warranted" decision.[1] The administrative record supports FWS's decision, which is based on a comprehensive species review and complies with the ESA. The Court should find FWS acted reasonably and uphold this decision.

Plaintiffs' opposition brief again attacks FWS's population viability analysis ("PVA") modeling, criticizes FWS for not considering certain private lands data that FWS never had, confuses the elements of a "significant portion of its range" ("SPR") analysis, and asks this Court to substitute its judgment for FWS's judgment on what constitutes a reliable foreseeable future timeframe and adequate existing regulatory mechanisms. Plaintiffs gloss over the fact that FWS acknowledged data limitations, including that FWS likely *under*-estimated the initial population sizes in its modeling, yet still found that the risk factors acting on the species and its habitat over the next 80 years did not rise to the level of imminence, scope, or magnitude such that listing was warranted. For

---

[1] Plaintiffs' Complaint also challenged the Eastern DPS "not warranted" decision, but their opening brief raised those arguments only in footnotes, ECF No. 29 ("Pls' MSJ") at 20 n.10, 23 n.11, 27 n.15, and their reply brief entirely omitted those arguments. In the Eleventh Circuit, arguments raised only in footnotes or abandoned are deemed waived. *See, e.g.*, *Lavigne v. Herbal Life, Ltd.*, 967 F.3d 1110, 1120 n.7 (11th Cir. 2020) ("Normally, we do not review arguments that were raised only in a footnote."); *W. Flagler Assocs. v. City of Miami*, 407 F. Supp. 3d 1291, 1297 (S.D. Fla. 2019) (deeming argument abandoned where reply brief failed to address opposing party's responses).

these reasons, as well as those in Defendants' cross-motion for summary judgment and below, this Court should enter judgment in Defendants' favor.

## ARGUMENT

### I. FWS Used Best Available Science When Applying the PVA Model.

#### A. Immigration

FWS appropriately included immigration as a parameter in the PVA model because the best available science shows that immigration affects gopher tortoise population dynamics. *See* FWS_3552; FWS_6202; FWS_10419.[2] FWS tested and acknowledged the model's high sensitivity to changes in immigration input values, and FWS's decision relied on the scenarios where the immigration rate remained a constant, conservative estimate. FWS_3679-80. FWS flagged immigration as a topic for further study, FWS_3472-73, but did not need to perfect the model or further probe the sensitivity analysis results before making its gopher tortoise decision. *See Texas v. EPA*, 91 F.4th 280, 297 (5th Cir. 2024) (That a model has imperfections or limitations "is not, in itself, a reason to remand agency decisions based upon it." (citation omitted)); *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 85 (D.D.C. 2007) ("It is well settled . . . that [an agency] can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed"). Requiring FWS to do so would contradict the ESA's mandate to

---

[2] In a footnote, Plaintiffs claim it is notable that Defendants cite to a certain study in the record co-written by one of the proposed amici. ECF No. 46 ("Pls' Opp.") at 2 n.2. Defendants appropriately cite to supporting record documents. Defendants also oppose the attempt by proposed amici (including an author of that study) to bring in post-decisional information to repeat points in Plaintiffs' opening brief. *See* ECF No. 32. Plaintiffs fail to show any inconsistency in these positions.

2

use the best data available at the time of decisionmaking.16 U.S.C. § 1533(b)(1)(A); *see also Defs. of Wildlife v. Jewell*, 70 F. Supp. 3d 183, 194 (D.D.C. 2014).

Plaintiffs compare the results of the Folt et al. (2022) and Species Status Assessment ("SSA") models but admit that each study used different inputs. Pls' MSJ at 15 (describing that Folt et al. omitted populations smaller than 8 individuals while the SSA included them); Pls' Opp at 3 (acknowledging the different immigration selection methods). When different inputs are used, it is logical that the results may vary. To the extent that Plaintiffs believe Folt et al. (2022) produced more accurate results because it projected fewer tortoises, Folt et al. ultimately came to the same conclusion as FWS: "While the number of individuals, populations, and metapopulations were predicted to decline across most scenarios, overall projections suggest that overall extinction risk for the gopher tortoise is low in the future [to 2100]. . .The persistence of relatively large numbers of individuals and populations suggests resiliency of the species in the face of global change and redundancy to buffer from future catastrophic events." FWS_11133. FWS satisfied its obligation to use the best available data by including estimates of immigration in its PVA model. FWS also reasonably relied on the results of scenarios where immigration remained constant – not the immigration sensitivity analysis results.

### B. Maturation Rate

FWS also properly incorporated maturity rate as a parameter using the "Lefkovitch" (stage-based) modeling technique that was developed in 1965 and applied to gopher tortoise populations in 2021. *See* FWS_11501 (Folt et al. (2021), applying "Lefkovitch model"); FWS_11785 (Kendall et al. (2019), referencing the category of "Lefkovitch matrices"). Defendants do not ask the Court to rely on the Lefkovitch model

3

itself; the citation in Defendants' opening brief was intended to show how long it has been around and who has cited to it. Notably, FWS received no objections to its use of a Lefkovitch model or recommendations for other methodology from peer reviewers. To the contrary, one reviewer pointed to the Folt et al. (2021) paper as a recommended method for how to approach modeling for the SSA. *See* FWS_3596 ("[Folt et al. (2021)] should be cited/discussed when presenting minimum viable populations and associated parameters/ assumptions.").

Plaintiffs note that Kendall et al. (2019) "found that the use of the flat-age-within stage approach is rare (7% of examined studies)," Pls' Opp. at 5, but fail to mention that the cited percent is based on a tiny sample size. FWS_11789. Kendall et al. evaluated an "admittedly small" sample of stage-structured models – only 67 in total. FWS_11789, 11792. Of that small sample, they "were able to unambiguously" identify maturation rate approaches for only 14. FWS_11789. From these 14 samples, Kendall et al. determined that 64% used an approach that they classified as an "error" – either a flat age-within-stage approach, a stationary age-within-stage approach, or an observed approach. *Id.* Kendall et al. concluded that "[n]evertheless" these "flawed" studies may have "broad validity." FWS_11792. "For example, in none of the case studies did the errors introduce misclassifications of population decline versus increase." *Id.*

FWS considered the Kendall et al. (2019) study[3] and did not "disregard[] available scientific evidence that is in some way better than the evidence [it] relies on."

---

[3] Plaintiffs question whether FWS considered Kendall et al. (2019). Pls' Opp. at 5. The fact that the study is in the amended administrative record speaks for itself. *See Save the Manatee Club v. EPA*, No. 6:22-cv-868-CEM-LHP, 2023 WL 4195043 at *3 (M.D. Fla. May 24, 2023) ("[L]ower courts have elaborated that the full administrative record includes all documents and materials directly or indirectly considered by agency

4

*Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008) (citation omitted). FWS is entitled to choose which studies to rely on and which modeling techniques to use. *Id.* at 998-99 (holding that agency's use of available data and test methods was reasonable even though arguably better methods existed because those had not yet been used on species in question); *Nat. Res. Def. Council v. U.S. Army Corp. of Eng'rs*, No. 99CV2899, 2001 WL 1491580, at *9 (S.D. Fla. June 28, 2001) ("On judicial review, the role of the Court is not to attempt to become a tie-breaking technical expert."). As per its prerogative, FWS chose to use the Leftkovitch model that Folt et al. applied to gopher tortoises, and Plaintiffs have not demonstrated that Kendall et al. is better.

### C. Threat of Urbanization

FWS has already demonstrated that it analyzed the threat of urbanization, applying the Slope, Land use, Exclusion, Urban, Transportation, and Hill-shade ("SLEUTH") model to habitat management of local population data for lands managed for conservation. ECF No. 36 ("Def. Br.") at 14. Plaintiffs focus instead on private lands, even though FWS did not have geospatial or abundance data for gopher tortoise occurrences on private lands. Pls' Opp. at 6 n.9. *But see Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 600 (D.C. Cir. 2023) (Courts do not "require scientific reasons or calculated probabilities when no reasons or calculations are possible"). Plaintiffs assume gopher tortoises on private lands are most at risk from development. Pls' MSJ at 19-20. Even if correct, FWS made a not warranted decision

---

decision-makers." (citations omitted)); *SOSS2, Inc. v. U.S. Army Corps of Eng'rs*, 403 F. Supp. 3d 1233, 1237 (M.D. Fla. 2019) ("Because an agency presumably knows the content of the record the agency considered, an agency's certification of the completeness of the administrative record receives a measure of presumed correction.").

5

without factoring in the gopher tortoises on private lands, which means FWS likely *under-*estimated the species' viability, not overestimated it. FWS_3417. Also, FWS noted evidence of gopher tortoise conservation efforts on private lands, so Plaintiffs' assumption of threat level is not necessarily accurate. FWS_3394-401.

Plaintiffs remain confused about how FWS reached conclusions on gopher tortoise resiliency. Pls' Opp. at 6-7. Primarily, FWS evaluated the estimated current abundance (*i.e.*, population estimate) of local populations by reviewing data on state, federal, local government, and private lands, collected in various ways. FWS_3416. Using the Gopher Tortoise Council's "minimum viable population" size categories for minimum viable, primary support, and secondary support populations, FWS sorted the available abundance data. FWS_3416-17; *see also* FWS_3339 (Gopher Tortoise Council report, describing those categories). FWS used the minimum viable population size categories to sort data, not as required targets that, "if not met, will result in certain population demise." FWS_3415. FWS was not "selectively rely[ing] on portions of the [Gopher Tortoise Council] study," as Plaintiffs incorrectly claim. Pls' Opp. at 7 n.10.

FWS also analyzed how habitat quantity and quality and management factors contribute to resiliency. FWS_3429. For habitat quantity and quality, FWS used the Crawford et al. (2020) Habitat Suitability Index and results from private landowner questionnaires. FWS_3423-35; *see also* FWS_3601 (confirming that FWS applied the Crawford model habitat suitability layer to identify suitable habitat). To assess gopher tortoise management, FWS used several data sets available from multiple sources and at multiple spatial scales. FWS_3426-29 (SSA, describing the data sets in more detail). Although FWS analyzed these habitat and management factors in the SSA, FWS only

6

relied on local population abundance for its determination of resiliency in the listing determination because that data was more reliable and consistent; the data collected on habitat and management efforts varied greatly across populations. FWS_3676.

In sum, FWS did not use "analytical sleight of hand" to "discount the . . . threat from habitat destruction." Pls' MSJ at 19 n.9. FWS considered habitat quality and quantity and described its analysis but appropriately gave more weight to the best data available, consistent with the ESA.

## II. FWS's SPR Analysis Is Reasonable and Should Be Upheld.

In this case, FWS reasonably determined that the portion of the range with a different status (Units 1 and 2) was not "significant based on its biological importance to the overall viability of the gopher tortoise." FWS_3683; *see also* Def. Br. at 19-25. Plaintiffs argue that this analysis is flawed for two reasons, but neither is persuasive.

First, contrary to Plaintiffs' argument, Pls' MSJ at 22-23, FWS did not apply an interpretation of "significant" that functionally required the species to be endangered throughout all of its range, rather than just a portion. *Cf. Desert Survivors v. U.S. Dep't of the Interior*, 321 F. Supp. 3d 1011, 1070-74 (N.D. Cal. 2018). Instead, FWS evaluated significance by considering whether a portion of the tortoise's range was biologically important to the species overall in one of four ways. FWS_3683-84. Plaintiffs primarily complain that, by looking at the viability of the species *overall*, FWS necessarily required the species to be endangered or threatened throughout all of its range. Pls' Opp. at 9-10. Not so. Under FWS's methodology here, portions of the range can qualify as "significant" even if the species overall would not be endangered or threatened without those portions. For example, under the third consideration, a

7

significant portion could act as "a refugia" or contain "an important breeding area," while other portions may contain refugia or breeding areas that are less essential but still contribute to the species' viability. FWS_3691 (explaining third consideration for Unit 2).

FWS's analysis aligns with the ESA. Congress made plain that the ESA is a species recovery statute. 16 U.S.C. § 1531(b). Thus, it is entirely consistent with the statute for FWS to determine "significant portion of its range" by evaluating the importance of a specific portion to the species overall. Indeed, if the SPR analysis did *not* consider how a portion of the range contributes to the viability of the species, as Plaintiffs request, it would be aimless. Measurements like geographic size or number of individuals in the range, for example, mean nothing in a vacuum. Under FWS's analysis here, a portion of the tortoise's range could be significant if it is unique or high-quality, regardless of size or number of tortoises. *Cf. Desert Survivors v. U.S. Dep't of the Interior*, 321 F. Supp. 3d 1011, 1075 (N.D. Cal. 2018).

Because FWS's analysis is clearly consistent with the ESA, this court does not need to go further and definitively decide the best meaning of "significant." Indeed, Plaintiffs have not even offered their view of the best interpretation of the statute. This case thus can be resolved under the well-established arbitrary and capricious standard of review, as Plaintiffs concede. Pls' Opp. at 9-10.

Second, Plaintiffs have not met their burden to show that FWS's SPR analysis of Units 1 and 2 is arbitrary and capricious. As explained in Defendants' opening brief, FWS's conclusions are supported by the best available science and should be upheld. Def. Br. at 21-25. In response, Plaintiffs continue to conflate the separate "status" and "significant" inquiries of the SPR analysis. The threat of habitat loss and fragmentation

8

were part of the "status" analysis. FWS_3683. FWS determined that Units 1 and 2 have a different status than the remainder of the range. *Id.* By contrast, the natural quality and size of the habitat were part of the "significant" analysis. FWS_3684. FWS reasonably determined that the portion of the range where the species has a different status (Units 1 and 2) does not contribute high-quality or high value habitat for gopher tortoise, so is not "significant." FWS_3684; *see also* FWS_3340 (describing natural quality of soils in western range as loamy and containing more clay); FWS_3417 (explaining Units 1 and 2 support smaller numbers of tortoises likely due to differences in soil); FWS_3440 (discussing "natural variation in climate and soils" in western portion of range); FWS_3425 (listing estimated acreage of suitable habitat by analysis unit).

As to genetic variation, Plaintiffs are correct that an SPR analysis can include consideration of genetic data. Pls' Opp. at 11 (quoting FWS response to comments on partially vacated SPR Policy that recognizes genetic data "may be relevant"). But Plaintiffs identify no requirement that an SPR analysis *must* include consideration of genetic data. For the gopher tortoise, FWS considered genetic data under the DPS analysis and found that the western (Unit 1) and eastern (Units 2 through 5) population segments of the species' range are separated geographically by the Mobile and Tombigbee Rivers, which act as a barrier to dispersal and gene flow. FWS_3686. FWS also found that the loss of the western population would result in a substantial reduction in the presence of unique genetic characteristics. *Id.* FWS thus determined the western population is a DPS warranting continued listing.

In terms of practical effect on the ground, Plaintiffs' argument comes down to Unit 2, since Unit 1 is already federally protected under the ESA. FWS considered Units

9

1 and 2 together for the rangewide SPR analysis and found that portion not "significant." FWS_3684. FWS also considered Unit 2 alone, as a portion of the Eastern DPS, and found that Unit 2 had a different "status" but was not "significant." FWS_3691. To the extent Plaintiffs claim Unit 2 is "significant" such that the species should be listed, the record does not support their argument. Plaintiffs carry the burden to show that FWS acted arbitrarily, and they have not done so. FWS's SPR conclusion should be upheld.

### III. FWS Chose a Reasonable Foreseeable Future Timeframe.

Plaintiffs' argument that "foreseeable future" for the gopher tortoise should go beyond 80 years because FWS had data on threats beyond 80 years, Pls' Opp. at 13 (citing FWS_11183 (Sweet et al. (2022)), fails to appreciate that the "foreseeable future" is the extent to which FWS can *reasonably rely* on predictions about the future of both threats to the species and the impact of those threats on the species. *See* Def. Br. at 26. The existence of data beyond 80 years does not make that data sufficiently reliable to satisfy the standard. While Sweet et al. (2022) predicted sea-level change and greenhouse gas emissions out to 2150, the study indicated that it placed a "specific emphasis on the near-term period, 2020-2050," and warned of "less informative" uncertainties beyond the near term. FWS_11208, 11209. The Court should uphold FWS's decision to set the foreseeable future timeframe based on data reliability.

### IV. FWS Considered the Inadequacy of Existing Regulatory Mechanisms.

In determining the gopher tortoise's status throughout all of its range, FWS considered already-implemented and ongoing conservation efforts, *see* FWS_3378-401, and concluded that certain threats such as habitat loss have been reduced and will continue to be reduced by some of these efforts. FWS_3682. Although FWS did not

10

explicitly state that the existing regulatory mechanisms were adequate, FWS "did not need to do so. The path to its conclusion was readily apparent." *Ctr. for Biological Diversity ("CBD") v. FWS*, 690 F. Supp. 3d 322, 345 (S.D.N.Y. 2023). As with the listing decision in *CBD*, *id.* at 344, the gopher tortoise decision reflects that FWS evaluated each threat to the species individually and their expected effects, then analyzed the cumulative effect of the threats before considering how certain conservation efforts reduce threat severity. FWS_3672. "The agency plainly understood its obligation to consider existing regulatory mechanisms." *CBD*, 690 F. Supp. 3d at 344 (referring to agency's obligation under 16 U.S.C. § 1533(a)(1)(D)).

Plaintiffs are correct that the Policy on Evaluation of Conservation Efforts ("PECE") "applies to those formalized conservation efforts that have not yet been implemented or have been implemented, but have not yet demonstrated whether they are effective at the time of a listing decision." 68 Fed. Reg. 15100, 15113 (Mar. 28, 2003). However, to the extent Plaintiffs interpret the policy to mean that FWS must affirmatively analyze the certainty of effectiveness for every conservation effort it considers, even those that have been ongoing for years with successful results, that is clearly an incorrect reading. The two example scenarios that the PECE provides of when the policy should be applied are unlike the ongoing-for-years or already completed efforts considered by FWS in its gopher tortoise determination. *Compare id.*, *with* FWS_3669-71 (describing gopher tortoise conservation efforts considered and success or achievement of each category).[4]

---

[4] FWS considered translocation and headstarting, acknowledged the immediate success data but lack of long-term success data, and did not solely rely on those efforts for the final determination on existing regulatory mechanisms. FWS_3669-70.

11

## REMEDY

The record before the Court supports FWS's decision that listing the gopher tortoise rangewide as threatened or endangered under the ESA is not warranted. However, if the Court finds in Plaintiffs' favor, Defendants request the opportunity for supplemental remedy briefing. In their opposition brief, Plaintiffs argue that vacatur is the ordinary remedy, and thus no further briefing is necessary. Pls' Opp. at 14. First, the Eleventh Circuit has recognized that vacatur is not the only remedy available under the Administrative Procedure Act. *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 317 (11th Cir. 2025) (citing *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015)). Second, Defendants request supplemental briefing to address the scope and timing of any remand in light of this Court's specific ruling. On remand, an agency can either "offer a fuller explanation of the agency's reasoning at the time of the agency action" or alternatively "deal with the problem afresh by taking new agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20-21 (2020). If the Court were to find error in this case, its specific ruling may impact which path FWS would take, and how much time that path would require.

## CONCLUSION

For the reasons stated above and in Defendants' opening brief, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Respectfully submitted this 18th day of April, 2025.

                ADAM R.F. GUSTAFSON
                Acting Assistant Attorney General
                Environment & Natural Resources Division
                NICOLE M. SMITH, Assistant Section Chief

/s/ Taylor A. Mayhall
TAYLOR A. MAYHALL
Trial Attorney (MN Bar No. 0400172)
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 598-3796
Taylor.mayhall@usdoj.gov

*Counsel for Federal Defendants*